E. & J. GALLO WINERY, a California corporation, Plaintiff-counter-defendant-Appellee,

v.

GALLO CATTLE COMPANY; Michael D. Gallo; Joseph Gallo, Defendants-counter-claimants-Appellants,

v.

Ernest GALLO; Julio Gallo, Counter-defendants-Appellees.

No. 89–16271.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 14, 1990.

Decided Feb. 7, 1992.

As Amended on Denial of Rehearing and Rehearing En Banc June 22, 1992.

Roy G. Weatherup, Haight, Brown & Bonesteel, Santa Monica, Cal., for defendants-counter-claimants-appellants.

Patrick Lynch, O'Melveny & Meyers, Los Angeles, Cal., for plaintiffs-counter-defendants-appellees.

Before: TANG, FLETCHER, and REINHARDT, Circuit Judges.

FLETCHER, Circuit Judge:

Defendant/Counterclaimant Joseph E. Gallo ("Joseph") appeals. Plaintiff/Counterdefendant E. & J. Gallo Winery ("the Winery"), owned by Joseph's older brothers Ernest and Julio Gallo, initially brought a trademark infringement action against Joseph for the use of the name GALLO on retail packages of cheese. Joseph counterclaimed against the Winery and Ernest and Julio, asserting that he had inherited a one-third ownership interest in the Winery (and thus its trademarks) from their parents who died in 1933. The district court granted summary judgment in favor of Ernest and Julio on the counterclaims, granted judgment following a bench trial in favor of the Winery on the trademark claims, and permanently enjoined Joseph from using the GALLO name as a trademark on retail packages of cheese and in advertisements.

On appeal, Joseph seeks reversal of the judgments, but challenges as well the scope of the injunction. He also appeals the denial of his motion for a new trial, arguing that Judge Coyle should have disqualified himself. We AFFIRM, but modify the scope of the injunction.

## FACTS

This lawsuit arises out of a tortuous family history apparently involving sibling rivalry on a grand scale. Because Joseph's counterclaims concern his parents' estates, the relevant facts date back nearly a century.

I. *The Rise of the Gallo Family, the Establishment of the Winery, and Ernest and Julio's Guardianship of Joseph*

The individual parties to the action, Ernest, Julio, and Joseph, are the children of Joseph Gallo ("Joseph Sr.") and Assunto ("Susie") Bianco, immigrants to Northern

California from Italy in the early 1900s. Joseph Sr. and Susie married in 1908. Ernest was born in 1909, Julio in 1910, and Joseph in 1919. Following their marriage until the advent of Prohibition in 1919, Joseph Sr. and Susie operated various boarding-houses and saloons, in connection with which they served and sold wine purchased from other California wine dealers. Evidently they stenciled the family name GALLO on the ends of the wine kegs, although they did not make the wine themselves. Throughout the 1920's, the family purchased a series of vineyards, where they grew their own wine grapes, bought wine grapes from other local growers, and shipped the grapes to the midwest and the east coast, where customers made wine with them for their home use under an exception to Prohibition. Ernest and Julio became involved in this shipping business during the mid- to late–1920s. While Joseph Sr. did have a brush with the law for bootlegging during Prohibition, there is no other evidence that he and Susie sold wine after 1919.

The Great Depression caused the grape business to suffer. Prices dropped; the 1932 season was a financial disaster for Joseph Sr. and Susie. On June 21, 1933, Joseph Sr. took Susie's life and his own.

In a holographic will, Susie left each son a one-third interest in her estate. On April 4, 1935, the probate court approved the first and final account of Susie's estate, and entered a decree distributing a one-third interest in her stock and real property holdings to each son. The accounting for Susie's estate listed no wine business nor assets of a wine business.

Joseph Sr. died intestate. Ernest obtained a court order authorizing him to continue Joseph Sr.'s business, described as "that of raising grapes and other crops and farming and selling produce." On April 29, 1935, the probate court approved Ernest's second and final account of Joseph Sr.'s estate, and entered a decree distributing a one-third interest in the remaining assets of the estate to each son. The account did not list any wine business or assets of a wine business, but it did list "E.

& J. Gallo Winery" as a creditor of the estate.

"E. & J. Gallo Winery" refers to the partnership Ernest and Julio formed after their parents' deaths. The brothers had obtained a license to establish a bonded winery which could lawfully produce wine for medicinal purposes during Prohibition. Prohibition ended on December 5, 1933, and on that day the E. & J. Gallo Winery began shipping wine out of Modesto in barrels marked GALLO.

During all of this, Joseph was still a child. He was only 13 years old when his parents died, and Ernest and Julio did not make him a partner in the Winery. He lived with his brothers, who became his legal guardians by order of the probate court on February 19, 1934. Ernest and Julio did not conduct a model guardianship. They filed no inventory of the guardianship estate at its inception, nor did they file any annual accountings during the ensuing years of the guardianship. In 1936 they obtained an order from the probate court authorizing them to sell the shares of stock Joseph had inherited from Susie, but then loaned the proceeds to the Winery without the court's authorization. Joseph attained majority on September 11, 1940, and on June 20, 1941, Ernest and Julio filed a first and final account of the guardianship.

A month after Ernest & Julio filed the account, Joseph and his counsel filed objections, claiming, in addition to the proceeds of Joseph's stock, the sum of $25,000 as his portion of the profits generated by the Winery through unauthorized investment of guardianship funds. On July 2, 1941, the probate court entered its decree, adopting Ernest and Julio's account, as supplemented by a payment from the Winery to Joseph of $20,000. This sum was declared to be "in full and complete settlement of" Ernest and Julio's liability arising from their use of Joseph's capital for investment in the Winery.

*II. The Gallo Brothers Develop their Businesses*

Ernest and Julio continued to develop their wine business through the 1930s, sell-

ing the wine in barrels and tank cars to regional bottlers, who in turn sold the wine under their own trademarks. It was not until 1940, when the Winery began its own bottling operations, that the GALLO label was seen by the consuming public. In 1942, the Winery obtained its first registered trademark including the word GALLO. The following year Ernest and Julio moved the bottling operations to Modesto, and by the early 1960s, they had established distribution of the Gallo brand in all major U.S. markets. Today, following several decades of extensive advertising and promotion, GALLO wine has become the best-selling brand in the country.

Including its first trademark in 1942, the Winery has acquired eleven different registered trademarks containing GALLO. Ernest and Julio themselves registered all but one of the eleven. The exception is a trademark initially obtained by a company called Gallo Salame that developed in the late 1940s independently from the Gallo family—nobody in the company bore the name of Gallo. Gallo Salame initially sold salami and other prepared meat products to the service delicatessen trade, but in 1959 it began selling its products directly to consumers. By 1970 Gallo Salame was selling combination packs of sliced cheese and salami or pepperoni, and that year it obtained a registered trademark consisting of a shield with the word "Gallo" in script, together with a depiction of the Golden Gate Bridge and a cable car. In 1979, the Winery sued Gallo Salame for trademark infringement and dilution, and in 1983 the parties settled, with Gallo Salame assigning its registered trademark to the Winery as part of the settlement. The settlement also licensed the GALLO SALAME mark back to Gallo Salame, which continues to manufacture and sell its products under the mark.

Joseph's involvement with the Winery was limited. He lived and worked with his brothers on the ranches and in the Winery until he entered military service in 1942. Four years later, Joseph returned to manage several of the Winery's ranches. At some point during the early development of the Winery, Ernest and Julio invited Joseph to become a partner, but he declined.

Joseph managed the Winery's ranches until 1967, during which time he purchased and farmed several pieces of land, including vineyards and a dairy. In many of these ventures he used his name, "Joseph Gallo", as a trade name. He sold grapes from his vineyards—many to the Winery—under the trade name "Joseph Gallo Vineyards", and he operated his ranches under similar trade names incorporating his own name. In 1955, he established the "Gallo Cattle Company", a partnership, and he proceeded to raise and sell dairy cattle on the land not dedicated to the vineyards. In the late 1970s, the Gallo Cattle Company established a large dairy, and in 1983, it entered the cheese business.

Joseph's original intention in entering the cheese business was to sell cheese in large blocks to commercial purchasers, who would then repackage the cheese for consumer distribution. However, in 1984, Joseph began distributing consumer size packages of cheese for the retail market, labeled with a trademark consisting of his name, "Joseph Gallo", and a pastoral scene of cows and a dairy barn.

Later that year, Ernest and Julio learned that Joseph was selling retail cheese labeled JOSEPH GALLO, and Ernest told him that this infringed the Winery's trademarks and violated a prior oral commitment Joseph had given not to use the GALLO name on his products. The Winery also notified Gallo Salame, which insisted that the Winery either stop Joseph from using the mark or get him to enter into a licensing agreement with the Winery. For two years, the Gallo brothers negotiated unsuccessfully. Finally, on April 17, 1986, the Winery filed its complaint against Joseph, the Gallo Cattle Company, and Michael D. Gallo, Joseph's son and general partner of Gallo Cattle (collectively, "Joseph" or "defendants").

## III. The Litigation.

The Winery's complaint included claims for trademark infringement, trademark di-

lution, and unfair competition, and sought an injunction preventing Joseph from marketing, advertising, selling, or distributing cheese bearing any trademark containing the word GALLO. In his answer, Joseph raised twelve affirmative defenses and brought several counterclaims against the Winery and Ernest and Julio. He asserted a constructive trust, arguing that Joseph Sr. and Susie had founded the Winery, and that he therefore had inherited a one-third interest in it. He also sought damages from Ernest and Julio for breach of fiduciary duty, deceit, and constructive fraud in the conduct of the guardianship.

On June 6, 1988, after extensive and apparently contentious discovery, the district court heard argument on the parties' cross-motions for summary judgment. On August 29, 1988, Judge Price issued his memorandum decision granting the Winery's motion for summary judgment on Joseph's counterclaims. He found Joseph's claims barred by *res judicata,* based on the decrees issued by the various probate courts after Joseph Sr. and Susie died and upon the termination of Joseph's guardianship. He also held that Joseph had presented no evidence that Ernest and Julio had practiced fraud on the probate court. Judge Price denied Joseph's motion for summary judgment on the Winery's trademark claims, and set the matter for trial beginning November 15, 1988.

On November 1, the court denied Joseph's motions for certification and stay pending appeal, and on November 10, Joseph moved to have Judge Price recuse himself pursuant to 28 U.S.C. § 455 because of his alleged personal friendship with one of the Winery's directors. On November 14, without conceding the necessity for his disqualification, Judge Price transferred the case to Judge Coyle.

Following a seventeen-day bench trial on the Winery's claims from November 22 through December 28, 1988, Judge Coyle ruled for the Winery and issued an order on June 19, 1989 permanently enjoining Joseph from using the GALLO mark on

retail cheese packages and from using the GALLO name in advertising. Among Joseph's post-trial motions was a motion for new trial, based primarily on the assertion that Judge Coyle should have recused himself under 28 U.S.C. § 455 because he had been a partner in the law firm that represented the Winery as local counsel in its trademark suit against Gallo Salame. On August 4, Judge Coyle denied the motion, concluding that the motion for recusal was untimely and also lacked merit.

Joseph appeals Judge Price's grant of summary judgment to the Winery on his counterclaims, Judge Coyle's judgment for the Winery on the trademark claims, and Judge Coyle's denial of his motion for a new trial. Joseph also challenges the permanent injunction issued by Judge Coyle as fatally ambiguous, overbroad and in violation of the first amendment.

## JURISDICTION

The district court had jurisdiction over the Winery's trademark infringement claim under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1337, & 1338, pendant jurisdiction over the Winery's state claims of trademark dilution and unfair competition, and ancillary jurisdiction over Joseph's counterclaims. This court's jurisdiction derives from 15 U.S.C. § 1121 and 28 U.S.C. § 1291.

## DISCUSSION

### I. Summary Judgment for the Winery on Joseph's Counterclaims

█ Joseph contends that Judge Price erred in granting summary judgment for the Winery on his counterclaims. He argues that the evidence he presented to the district court, considered in the light most favorable to him, raised genuine issues of material fact as to his asserted one-third interest in the Winery. He cites evidence that the Winery was an outgrowth of his father's business and thus part of his father's estate, in which he inherited a one-third interest.[1] However, the district court

1. For example, Joseph argues that an underground concrete tank constructed by Joseph Sr.

shortly before his death indicates an intent to start up a winery following Prohibition; that

granted the Winery's summary judgment motion not on the ground that Joseph had presented no genuine issue of material fact, but on the ground that *res judicata* barred his claims. We review both summary judgment and *res judicata* determinations *de novo.* *Darring v. Kincheloe,* 783 F.2d 874, 876 (9th Cir.1986) (summary judgment); *Guild Wineries and Distilleries v. Whitehall Co.,* 853 F.2d 755, 758 (9th Cir.1988) (*res judicata*); *Blasi v. Williams,* 775 F.2d 1017, 1018 (9th Cir. 1985) (*res judicata*).

In finding the counterclaims to be barred by *res judicata,* the district court focused primarily on the probate court's guardianship decree. However, the decrees of distribution in the estates of Joseph Sr. and Susie are also relevant. Under California law, an order settling an executor's account generally binds "all the parties interested in the estate, including minors who were not represented at [the probate hearing] by a guardian." *Carr v. Bank of America Nat'l Trust & Sav. Ass'n,* 11 Cal.2d 366, 79 P.2d 1096, 1099 (1938); *see also* Cal.Prob.Code 11605 (West Supp.1990) (order of probate court, including decree of distribution, "binds and is conclusive as to the rights of all interested persons"). Both the initial and final accountings filed by Ernest in his capacity as executor of Joseph Sr.'s estate identified the Winery as a creditor of the estate, not as an asset. The probate court's approval of the accountings therefore necessarily determined that the Winery was not part of the estate inherited by the Gallo brothers. *See In re Estate of Simonton,* 183 Cal. 53, 190 P. 442, 444 (1920) (final order of settlement held conclusive upon heirs as to property not inventoried as asset of estate yet known by heirs to exist).

An order of settlement also "conclusively negatives the charge of mismanagement, negligence or fraud on the part of the ... executor." *Carr,* 79 P.2d at 1101. However, where the order has been obtained by extrinsic fraud perpetrated by the executor, the order can be set aside. *Estate of Sanders,* 221 Cal.Rptr. 432, 710 P.2d 232, 235, (1985); *see also Lazzarone v. Bank of America,* 181 Cal.App.3d 581, 226 Cal.Rptr. 855, 863 (1986) (same rule applied to administration of testamentary trust). Extrinsic fraud essentially entails preventing a party "from presenting all of his case to the court," as opposed to defrauding the party with respect to the substantive rights being adjudicated at a proceeding. *Sanders,* 710 P.2d at 236 (quoting *United States v. Throckmorton,* 98 U.S. 61, 65–66, 25 L.Ed. 93 (1878)). The classic example of extrinsic fraud is where "the aggrieved party is kept in ignorance of the proceeding or is in some other way induced not to appear." *Sanders,* 710 P.2d at 236. Fraudulent concealment of assets by an administrator or guardian also constitutes extrinsic fraud. *Lataillade v. Orena,* 91 Cal. 565, 27 P. 924 (1891), *Simonton v. Los Angeles Trust & Sav. Bank,* 192 Cal. 651, 221 P. 368 (1923).

The same general principles apply to a probate court's order approving a final accounting of a guardianship:

> The established rule is that the final account of a guardian, when settled and approved, and not attacked by appeal or other proper proceeding, is res judicata and conclusive even against the ward.

*Adams v. Martin,* 3 Cal.2d 246, 44 P.2d 572, 573 (1935); *see also Guardianship of Naccarato,* 195 Cal.App.2d 118, 15 Cal. Rptr. 261, 262 (1961). Extrinsic fraud is, again, an exception to the rule of conclusiveness. *Barker v. Carver,* 144 Cal. App.2d 487, 301 P.2d 307, 310 (1956); *cf. Adams,* 44 P.2d at 573 (distinguishing cases involving extrinsic fraud).

It is therefore clear that in order to avoid a *res judicata* determination based on the three probate decrees, Joseph must demonstrate that Ernest and Julio engaged in extrinsic fraud. The district court ruled

---

Ernest and Julio used their father's grapes to make their wine; that they sold the wine they made under the same GALLO trademark that their parents had put on barrels of wine prior to Prohibition; and that Ernest and Julio have represented in several of their trademark registration applications that the Winery is a continuation of their father's business and that the GALLO mark has been used, initially by Joseph Sr., since the early 1900s.

that Joseph failed to establish any facts that evidenced extrinsic fraud. Joseph attended the guardianship hearing and was represented by counsel, who filed on his behalf objections to the account filed by Ernest and Julio. There is no suggestion that any assets were concealed from Joseph. The Winery was identified as a creditor in Ernest's final accounting of Joseph Sr.'s estate. More importantly, the Winery was the very focus of the hearing on the termination of Joseph's guardianship. The probate decree required a $20,000 payment to Joseph, "represent[ing] earnings realized by said guardians in the conduct of their business under the name of E. & J. Gallo Winery...." Implicit in this decree is a determination that the Winery was the business of Ernest and Julio, not part of Joseph Sr.'s estate. Joseph had the opportunity at this hearing to claim a one-third interest in the Winery but evidently did not do so. *See Getty v. Getty*, 187 Cal.App.3d 1159, 232 Cal.Rptr. 603, 610 (1986) (*res judicata* applies to matters that were actually raised or could have been raised).

In the absence of any showing of extrinsic fraud, we affirm the district court's conclusion that Joseph's counterclaims, which seek to upset probate decrees of more than fifty years' standing, are barred by *res judicata*. We need not reach the Winery's alternative ground of laches.

## II. Judgment for the Winery on Its Trademark Claims

The district court held that Joseph's use of his name on retail packages of cheese infringed the Winery's trademarks and constituted unfair competition under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a).[2] The court also held for the Winery on its state claim of trademark dilution, Cal.Bus. & Prof.Code § 14330. Joseph challenges the district court's judgment on several grounds, which are considered in turn.

### A. Judicial reluctance to enjoin use of a personal name

Joseph first contends that the district court erred in failing to consider an established "judicial reluctance" to enjoin the use of a personal name as a trademark. While recognizing that one has no absolute right to use one's personal name as a trademark, he nevertheless contends that the district court should have shown a greater reluctance to find that his use of his own name constituted trademark infringement.

██ It is true that the Ninth Circuit has expressed a "reluctan[ce] to preclude an individual's business use of his own name when no attempt to confuse the public has been made." *Friend v. H.A. Friend and Co.*, 416 F.2d 526, 531 (9th Cir.1969), *cert. denied*, 397 U.S. 914, 90 S.Ct. 916, 25 L.Ed.2d 94 (1970). However, as this language from *Friend* indicates, the reluctance does not extend to cases where there has been an attempt to confuse the public. *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1445 (9th Cir.1990). In fact, *Friend* itself upheld a ruling of trademark infringement and an injunction against use of a personal name by a junior user of the FRIEND mark who had "deliberately, vigorously, and successfully confused purchasers." *Id.* As for Joseph's intent in putting his name on the retail cheese packages, the district court found that he knew that the Winery would object to his use of the GALLO name and that he intended to capitalize on its reputation and selling power. Given these findings, the district court's determination of trademark infringement was fully consistent with *Friend*.

██ Even where a junior user lacks an intent to capitalize on another's trademark, use of an infringing personal name may still be limited by an injunction carefully tailored to balance the interest in using one's name against the interest in avoiding public confusion. *Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719, 725 (9th Cir.1985) (citing 1 J. McCarthy, Trademarks and Unfair Competition § 13:3(D) (2d ed. 1984)); *see also Basile, S.p.A. v. Basile*, 899 F.2d 35, 39 (D.C.Cir.1990); *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*,

---

**2.** As the district court noted, and as Joseph concedes, the elements of infringement and unfair competition claims are essentially the same; the rulings stand or fall together.

569 F.2d 731, 735–36 (2d Cir.1978). In other words, as long as the scope of the district court's injunction reflects a consideration of the judicial reluctance to enjoin use of a personal name, the court has acted properly. The district court's injunction, as modified in Section IV, *infra*, prohibits Joseph from using the words GALLO or JOSEPH GALLO as a trademark for retail sale of cheese or in audible advertisements. However, the injunction explicitly permits the use of JOSEPH GALLO as a trademark on wholesale packages of cheese, and permits the use of "Gallo Cattle Co." and "Joseph Gallo Farms" as trade names. It further permits the trade names or Joseph's signature to appear in advertisements. It is silent as to products other than cheese. By limiting the use of Joseph's name only to the extent necessary to avoid public confusion, the district court demonstrated the appropriate reluctance to enjoin all use of a person's name.[3]

### B. The GALLO SALAME trademark

Joseph claims that the Winery lacks a valid ownership interest in the GALLO SALAME trademark because the agreement settling the Winery's infringement suit against Gallo Salame represented an invalid assignment of the mark. Without valid ownership of the GALLO SALAME mark, Joseph further contends, the Winery's wine marks alone cannot support the district court's judgment, because wine and cheese are different products.

Under its settlement with Gallo Salame in 1983, the Winery received an assignment of the GALLO SALAME mark, which it then licensed back to Gallo Salame for its continued use on combination meat and cheese packages. Joseph argues that this constituted an invalid assignment in gross, because the assignment did not transfer the goodwill or tangible assets of Gallo Salame. Assignments of trademarks in gross are traditionally invalid. "[T]he law is well settled that there are no rights in a trademark alone and that no rights can be transferred apart from the business with which the mark has been associated."

*Mister Donut of America, Inc. v. Mr. Donut, Inc.*, 418 F.2d 838, 842 (9th Cir.1969), *criticized on other grounds, Golden Door, Inc. v. Odisho*, 646 F.2d 347 (9th Cir.1980). It is not necessary that the entire business or its tangible assets be transferred; it is the goodwill of the business that must accompany the mark. *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 676 (7th Cir.1982). As the Lanham Act states the principle, a mark is "assignable with the goodwill of the business in which the mark is used, or with that part of the goodwill of the business connected with the use of and symbolized by the mark." 15 U.S.C. § 1060. The purpose behind requiring that goodwill accompany the assigned mark is to maintain the continuity of the product or service symbolized by the mark and thereby avoid deceiving or confusing consumers. 1 J. McCarthy, Trademarks and Unfair Competition § 18:1(C) (2d ed. 1984).

The district court made a factual finding that goodwill had been assigned along with the mark GALLO SALAME. This finding rested on two facts. First, Gallo Salame gave to the Winery information "sufficient to enable [it] to continue the lure of business Gallo Salame had been conducting under the Gallo mark." This established the continuity that trademark law seeks to extend to the public. Second, the mark was transferred as part of the settlement of a *bona fide* infringement suit. It may not be immediately apparent why the settlement context implies transfer of goodwill. It does so because a *bona fide* infringement suit is predicated on the plaintiff's belief that the defendant has unfairly capitalized on plaintiff's goodwill; in other words, defendant wrongfully took goodwill from plaintiff. The district court found that prior to the assignment many consumers believed that Gallo Salame's products "were put out by the same company that put out Gallo wine. Since the Gallo brand had become equated with wine in the public mind, Plaintiff's goodwill rubbed off on Gallo Salame." It is this goodwill, the subject of the lawsuit, that was returned to the Winery.

---

**3.** Joseph's other challenges to the injunction are discussed in section IV, *infra*.

That the transfer of the GALLO SA-LAME mark served the goal of minimizing consumer confusion becomes most clear when we view the assignment/lease-back transaction as a whole. In approving it, the district court adopted the reasoning of the federal circuit in *VISA, U.S.A., Inc. v. Birmingham Trust Nat'l Bank*, 696 F.2d 1371 (Fed.Cir.1982), *cert. denied sub nom. South Trust Bank of Alabama v. VISA, U.S.A., Inc.*, 464 U.S. 826, 104 S.Ct. 98, 78 L.Ed.2d 104 (1983). In *Visa*, the court upheld an assignment/license-back of the mark CHECK–O.K., used in connection with check cashing services. The court found the arrangement to be valid as long as it satisfied the principal requirement applicable to all trademark licenses: that the licensor "provide[ ] for adequate control ... over the quality of goods or services produced under the mark." 696 F.2d at 1377; *see also Star–Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1396 (9th Cir.1985) (noting same requirement for valid license). The district court specifically found that the settlement agreement sets out, and that the Winery is maintaining, a quality control program under which the Winery actively monitors Gallo Salame's practices.

We agree with the federal circuit that a simultaneous assignment and license-back of a mark is valid, where, as in this case, it does not disrupt continuity of the products or services associated with a given mark. Here, consumers of Gallo Salame's products who mistakenly believed they were purchasing a product of the Winery were identifying the product with the Winery's goodwill. The assignment/lease-back had the beneficial effect of bringing "commercial reality into congruence with customer perception that [the Winery] was controlling [Gallo Salame's] use." 1 J. McCarthy, *supra* § 18:1(I). The assignment/license-back is a "well-settled commercial practice." *VISA*, 696 F.2d at 1377; *see also Syntex Laboratories, Inc. v. Norwich*

*Pharmacal Co.*, 315 F.Supp. 45, 55–56 (S.D.N.Y.1970), *aff'd on other grounds* 437 F.2d 566 (2d Cir.1971); *Raufast S.A. v. Kicker's Pizzazz, Ltd.*, 208 U.S.P.Q. 699 (E.D.N.Y.1980). We see no reason to invalidate it where it maintains the public's expectations of continuity.

### C. Likelihood of consumer confusion

■ The core element of trademark infringement is the likelihood of confusion, *i.e.*, whether the similarity of the marks is likely to confuse customers about the source of the products. *Academy of Motion Picture Arts and Sciences v. Creative House Promotions*, 944 F.2d 1446, 1454 (9th Cir.1991); *Eclipse Assoc. Ltd. v. Data General Corp.*, 894 F.2d 1114, 1118 (9th Cir.1990). Because likelihood of confusion is a mixed question of law and fact that is predominantly factual in nature, the panel reviews the district court's determination for clear error. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355–56 (9th Cir.1985) (en banc).

■ The district court made numerous findings concerning likelihood of confusion, applying eight factors set out by the Ninth Circuit in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir.1979). Those factors include: (1) strength of the allegedly infringed mark; (2) proximity or relatedness of the goods; (3) similarity of the sight, sound, and meaning of the marks; (4) evidence of actual confusion; (5) degree to which the marketing channels converge; (6) type of the goods and degree of care consumers are likely to exercise in purchasing them; (7) intent of the defendant in selecting the allegedly infringing mark; and (8) likelihood that the parties will expand their product lines. *Id.* at 348–54. This list of factors, while perhaps exhausting, is neither exhaustive nor exclusive.[4] *Id.* at 348 n. 11. Rather, the factors are intended to guide the court in assessing the basic question of likelihood of confusion. *Eclipse*, 894 F.2d at 1118. The presence or

---

**4.** In fact, as discussed in *Eclipse*, 894 F.2d at 1117–18, the Ninth Circuit also has approved other formulations of the test for likelihood of confusion. *See, e.g., Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444–46

(9th Cir.1980) (applying five factors); *J.B. Williams Co. v. Le Conte Cosmetics, Inc.*, 523 F.2d 187, 191–93 (9th Cir.1975) (applying six factors), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976).

absence of a particular factor does not necessarily drive the determination of a likelihood of confusion. We consider the factors examined by the district court in turn.

### 1. Strength

Trademark law offers greater protection to marks that are "strong," i.e., distinctive. The strength of a mark is determined by its placement on a "continuum of marks from 'generic,' afforded no protection; through 'descriptive' or 'suggestive,' given moderate protection; to 'arbitrary' or 'fanciful' awarded maximum protection." *Nutri/System, Inc. v. Con–Stan Industries, Inc.*, 809 F.2d 601, 605 (9th Cir.1987). While personal names used as trademarks are not inherently distinctive, they are treated as strong marks upon a showing of secondary meaning. 1 J. McCarthy, *supra* § 13:2; *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2d Cir.1976). Secondary meaning is the consumer's association of the mark with a particular source or sponsor. *Levi Strauss*, 778 F.2d at 1354.

The district court found that the GALLO mark has acquired secondary meaning through the Winery's long, continued use of the mark, the mark's widespread, national public recognition, and the Winery's extensive and expensive advertising and promotion of products bearing the mark. These findings are not clearly erroneous; in fact, Joseph concedes that the mark has acquired secondary meaning as applied to wine. He nevertheless argues that the mark's strength does not entitle it to protection in other product fields. This argument goes more to the question of related products, discussed below, than it does to strength. The finding that GALLO is a strong mark simply means that it is more distinctive than a descriptive or suggestive mark, and therefore more susceptible to protection as an initial matter.

### 2. Proximity or relatedness

Where goods are related or complementary, the danger of consumer confusion is heightened. *AMF*, 599 F.2d at

350. The district court found that wine and cheese are complementary products, frequently served and promoted together in wine and cheese tastings and parties. The court also found that salami and cheese are complementary products, that Gallo Salame sells these products in a combined package, that Joseph has sold a cheese product containing bits of salami, and that Joseph's cheese and Gallo Salame's products are sold in the same deli cases in grocery stores. The district court's finding that wine, cheese and salami are complementary products is not clearly erroneous. The finding is supported further by the independent finding that the products are marketed in the same channels, the fifth *AMF* factor.

### 3. Sight, sound, and meaning

In analyzing the similarity of the marks, the court is to view the marks as a whole, as they appear in the marketplace. *California Cooler v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1455 (9th Cir. 1985); *Alpha Industries v. Alpha Steel, Inc.*, 616 F.2d 440, 444 (9th Cir.1980). The key elements of the marks are their sight, sound, and meaning, and similarities in these characteristics "weigh more heavily than differences." *AMF*, 599 F.2d at 351.

In finding the marks to be similar, the district court focused on the shared use of GALLO as the dominant element in both the Winery's marks and Joseph's mark, as Joseph's cheese is generally referred to in the industry as Gallo cheese. The court conceded that the marks were not similar in appearance. Despite this concession, however, the district court found the shared dominant element of GALLO to be sufficient evidence to support a finding of similarity.

Joseph argues that the existence of the dominant element of GALLO in both the Winery's marks and in his mark cannot by itself constitute similarity, particularly since his first name is attached to GALLO on his cheese. Joseph relies on *Alpha Industries*, 616 F.2d at 444, and *Nutri/System*, 809 F.2d at 605–06, for the proposition that a dominant term shared by two marks

is not enough to support a finding of similarity. However, both of those cases affirmed district court findings of no similarity. Given the deferential review standard of clear error, cases *upholding* a district court finding do not mandate reversal of the district court's finding that the presence of GALLO in the marks employed by Joseph and the Winery does justify a finding of similarity. Moreover, neither *Alpha Industries* nor *Nutri/System* involved a personal name, and many courts have found the mere addition of a first name insufficient to prevent confusion. *See, e.g., Nina Ricci, S.A.R.L. v. E.T.F. Enterprises, Inc.,* 889 F.2d 1070, 1073 (Fed.Cir.1989) (VITTORIO RICCI infringes NINA RICCI); *John B. Stetson v. Stephen L. Stetson Co.,* 85 F.2d 586 (2d Cir.) (STEPHEN L. STETSON infringes STETSON), *cert. denied,* 299 U.S. 605, 57 S.Ct. 232, 81 L.Ed. 446 (1936). The district court's additional finding that Joseph's cheese is commonly referred to as "Gallo cheese" also supports the conclusion that the marks are similar. In sum, it does not appear that the district court committed clear error in relying on the dominant element GALLO for its finding of similarity in sight, sound and meaning.

4. Actual confusion

 Evidence of actual confusion is relevant to the issue of likelihood of confusion, but the absence of such evidence need not create an inference that there is no likelihood of confusion. *Levi Strauss,* 778 F.2d at 1360 n. 10. Here, the district court made numerous findings of actual confusion, centering on the Field Survey, a customer survey commissioned by the Winery and entered into evidence at trial. The core of Joseph's challenge to the district court's finding of actual confusion goes to the Field Survey, a national survey conducted under the supervision of Mervin Field.[5]

The Ninth Circuit has stated that surveys in trademark cases are to be admitted as long as they are conducted according to accepted principles. *See Prudential Ins. Co. v. Gibraltar Fin. Corp.,* 694 F.2d 1150, 1156 (9th Cir.1982), *cert. denied,* 463 U.S. 1208, 103 S.Ct. 3538, 77 L.Ed.2d 1389 (1983). "Technical unreliability goes to the weight accorded a survey, not its admissability." *Id.*

The Field Survey consisted of interviews with nearly 3500 adult shoppers in 35 different shopping malls throughout the United States. The interviewees were shown photographs of Joseph's cheese label,[6] and asked a series of questions, three of which related to confusion. The first question was, "Please tell me what individual, organization or company you believe puts out this cheese." Interviewees who named an individual, organization, or company were then asked two further questions: "What other products, if any, do you think [Response to Question 1] makes?" and "Any others?". Based on the data coded and collated by Field, and allowing for anomalies in the coding system, the district court found that actual confusion was at least 40% nationally and at least 47% in California.

Joseph claims that the survey's questions relating to confusion were slanted and that the interviewees' responses were coded improperly. Because of these flaws in the survey, Joseph argues, the district court abused its discretion in admitting the survey into evidence and then committed clear error in giving it the weight it did. The first argument fails. As noted above, it is routine to admit a relevant survey; any technical unreliability goes to weight, not admissability. *Prudential Ins.,* 694 F.2d

---

5. In addition to his attack on the Field Survey, Joseph contends that various of the other findings of actual confusion are erroneous. Specifically, he argues that they are findings relating to likelihood of confusion, not actual confusion. Given that likelihood of confusion is the ultimate question, this argument cannot help Joseph.

6. The interviewees were shown one of eight labels, four of which contained a disclaimer stating "Not affiliated with E. & J. Gallo Winery" and four of which did not. The degree of consumer confusion identified by the survey results did not differ significantly as between the interviewees who saw labels with the disclaimer and those who saw the labels without it.

at 1156. The district court did not abuse its discretion in admitting the Field survey.

The district court also properly considered what weight to give the survey. Joseph had his own expert witness testify about the reliability of the survey, and the district court did weigh that expert's testimony against Mervin Field's testimony. Ultimately the court concluded that "[i]n light of Mervin Field's 41 years' experience and preeminent reputation, Field's survey design is eminently trustworthy." This conclusion was not clear error.

### 5. Marketing channels

The district court found that wine, cheese and salami are sold and advertised in the same channels. While it may not be a finding of major significance, it is neither clearly erroneous nor irrelevant. *See AMF*, 599 F.2d at 353.

### 6. Type of goods and consumer care in purchasing them

When goods are expensive, it is assumed that buyers will exercise greater care in their purchases. *Id.* The district court found that consumers tend to exercise less care when purchasing lower cost items like wine and cheese, and thus rely more on brand names. Joseph disputes this contention, but presents no comprehensible argument about why the finding is clearly erroneous. While the finding may not prove much, the district court did not commit clear error.

### 7. Joseph's intent

A party claiming trademark infringement need not demonstrate that the alleged infringer intended to deceive consumers. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 157–58 (9th Cir.), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963). However,

> [w]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived.

*AMF*, 599 F.2d at 354; *see also Fleischmann*, 314 F.2d at 158. The district court made numerous findings concerning Joseph's intent in employing his name as a trademark on cheese, ultimately concluding that Joseph did intend to benefit from the familiarity of the Gallo name. Joseph claims that he acted in good faith, simply using his name as he always had in his prior business enterprises. His denials are not borne out by the record.

Joseph had told Ernest Gallo that he would not use his name as a trademark, and Ernest had informed him that the Winery would object if he did. Later, a potential sales manager recommended that Joseph use his name in order to benefit from the familiarity of the GALLO mark. A label designer made the same recommendation. While Joseph seemed reluctant to follow their recommendations at first, ultimately he overcame his reluctance. Shortly after he began selling the cheese under the JOSEPH GALLO mark, Ernest called him and told him that the mark violated their prior understanding. Joseph responded that he could make more money by using the mark. Taken together, these findings provide adequate support for the district court's determination that Joseph intended to take advantage of the goodwill of the GALLO mark.

### 8. Expansion of product lines

Finally, a strong possibility of expansion into competing markets weighs in favor of a finding of infringement. *AMF*, 599 F.2d at 354. Noting the Winery's ownership of the GALLO SALAME mark, the district court made a finding that the Winery had already entered the cheese market. Joseph argues that the Winery presented no evidence that it ever intended to expand into the wholesale cheese market. However, it is not clear why this is relevant, given that it is Joseph's *retail* cheese packages that are infringing the Winery's mark.

In light of all of the district court's findings considered above, we conclude that the district court did not commit clear error in making the ultimate finding that

Joseph's mark created a likelihood of confusion. As likelihood of confusion is sufficient grounds for an injunction under the Lanham Act, we have no occasion to determine whether the California antidilution statute would provide the Winery independent grounds for relief.

### D. Joseph's equitable defenses

 Joseph asserts that the district court erred in not considering his equitable defenses of laches, acquiescence, and estoppel to the Winery's claims. Equitable defenses can be considered in trademark infringement actions, even against an incontestable mark. *Pyrodyne Corp. v. Pyrotronics Corp.*, 847 F.2d 1398, 1401–02 (9th Cir.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988). Joseph's contention that the district court failed to consider his equitable defenses rests on the court's ninth conclusion of law, which states in part that the Winery's "rights in the registered GALLO marks may only be challenged on those grounds enumerated in 15 U.S.C. §§ 1064 and 1065." This conclusion is consistent with *Pyrodyne*. Laches and estoppel are defenses to the Winery's claim of trademark infringement, not challenges to the Winery's ownership rights in the GALLO mark.

 Beyond that, the district court plainly did consider Joseph's laches defense in its findings of fact. Under the heading "Laches" the court found that Joseph was not prejudiced by the Winery's failure to object to his use of his name in relation to Gallo Cattle Company and his other business properties. Joseph contends that the Winery's failure to object to his use of GALLO as a trade name constitutes acquiescence that he can employ as a defense in the present action. In making this argument, he relies on a statement in *Accuride International, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534 (9th Cir.1989), that modern trademark law protects trade names to the same extent as it protects trademarks. However, *Accuride* does *not* hold that a trademark owner's acquiescence in another's use of a similar trade name provides a defense to a subsequent trademark infringement action. The cheese package label was the first time Joseph had ever used the Gallo name on a retail product with which consumers have direct contact.

The district court further found that the Winery's response to Joseph's use of his name on the cheese was swift and firm. Even before Joseph began using the label, Ernest warned him not to. As soon as the Winery became aware that Joseph was using it, Ernest telephoned him again and asked him to stop. These findings, coupled with the finding of a lack of prejudice, amply support the conclusion that the district court considered Joseph's equitable defenses and rejected them on their merits.

### III. Denial of Joseph's Motion for New Trial

 Following the district court's ruling in favor of the Winery on its trademark claims, Joseph moved for a new trial pursuant to Fed.R.Civ.P. 59, claiming that Judge Coyle should have disqualified himself under 28 U.S.C. § 455. Judge Coyle denied the motion, finding that the disqualification request was untimely, and that it lacked merit in any event. Joseph appeals the denial of the new trial motion, a decision that is reviewed for abuse of discretion. *Hard v. Burlington Northern R.R.*, 812 F.2d 482, 483 (9th Cir.1987). The same standard of review applies to the district court's determination of whether recusal or disqualification is necessary under section 455. *Milgard Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703, 714 (9th Cir.1990).

 The disqualification statute reads in relevant part:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

. . . . .

(2) Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter. . . .

28 U.S.C. § 455. Prior to assuming the bench, Judge Coyle was a partner in the law firm of McCormick, Barstow, Sheppard, Wayte & Carruth ("McCormick, Barstow"), one of the law firms that is representing the Winery in the present case and had acted as local counsel for the Winery in the litigation over the GALLO SALAME mark.[7] Joseph does not contend that McCormick, Barstow's current representation of the Winery is grounds for Judge Coyle's disqualification, but he does contend that the firm's involvement in the GALLO SALAME litigation requires recusal under section 455(a) and (b)(2). He also alleges that Judge Coyle had joint real estate investments with some of his former law partners, creating a reasonable question as to his impartiality.

The threshhold issue is the timeliness of Joseph's argument that Judge Coyle should have disqualified himself and ordered a new trial. Joseph concedes that his counsel was aware of Judge Coyle's former law partnership at the time Judge Price transferred the case to Judge Coyle pursuant to Joseph's earlier section 455 motion. Despite having this knowledge, Joseph did not seek Judge Coyle's disqualification until after Judge Coyle had entered judgment against him on the merits. In denying the new trial motion, Judge Coyle found that the objection was not made in a timely fashion. On appeal, Joseph argues that he could not forfeit his right to make the challenge, because Judge Coyle had a mandatory duty under section 455 to disqualify himself *sua sponte*.[8]

It is true that under section 455 a judge may have an obligation to recuse himself or herself without a motion from one of the parties; it "is self-enforcing on the part of the judge." *United States v. Sibla*, 624 F.2d 864, 867–68 (9th Cir.1980). However, it does not necessarily follow that a party having information that raises a possible ground for disqualification can wait until after an unfavorable judgment before bringing the information to the court's attention. It is well established in this circuit that a recusal motion must be made in a timely fashion. *Molina v. Rison*, 886 F.2d 1124, 1131 (9th Cir.1989), *United States v. Conforte*, 624 F.2d 869, 880 (9th Cir.), *cert. denied* 449 U.S. 1012, 101 S.Ct. 568, 66 L.Ed.2d 470 (1980). "The absence of such a requirement would result in ... a heightened risk that litigants would use recusal motions for strategic purposes." *Preston v. United States*, 923 F.2d 731, 733 (9th Cir.1991). While there is no *per se* rule that recusal motions must be made at a fixed point in order to be timely, *see Preston* (section 455 motion timely even though made 18 months after assignment to district court judge and shortly after an adverse discovery ruling), such motions "should be filed with reasonable promptness after the ground for such a motion is ascertained." *Id.* at 733.

In this case, Joseph Gallo argues two grounds for disqualification. Joseph admits that he knew about the first—the judge's relationship with McCormick, Barstow—"[a]t the time Judge Coyle received this case." Judge Coyle received the case in November of 1988 and ruled for the Winery in June of 1989. Joseph raised the disqualification issue for the first time in his motion for a new trial. This was not timely. To hold otherwise would encourage parties to withhold recusal motions, pending a resolution of their dispute on the merits, and then if necessary invoke section 455 in order to get a second bite at the apple.

Joseph also argues that Judge Coyle should have disqualified himself because of

---

7. Judge Coyle stated that he was not aware of his former firm's involvement in the GALLO SALAME litigation until it was presented to him in Joseph's new trial motion. However, his lack of actual knowledge is irrelevant if the firm's involvement was such that a person knowing all the facts could reasonably question his impartiality. *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 859, 108 S.Ct. 2194, 2202, 100 L.Ed.2d 855 (1988) (scienter not an element of § 455(a)).

8. Joseph also contends that section 455(e), which precludes the parties from waiving recusal under subsection (b), makes timeliness irrelevant. However, the parties in this case did not offer to waive any potential grounds for disqualification. The timeliness of a party's presentation to the court of information it has that comprises a potential ground for disqualification is a different issue than that addressed by subsection (e).

the real estate investments. According to an uncontroverted assertion of Joseph's counsel, he did not learn of these investments until after the trial, when he saw a copy of a newspaper article from the Fresno Bee discussing Judge Coyle's farm and vineyard holdings. His objection potentially falls within the *Preston*'s language requiring that the motion be filed with "reasonable promptness after the ground for such a motion is ascertained." Joseph's counsel did not refer to the investments in his memorandum in support of the new trial motion, but did raise them during the hearing on the motion on July 31, 1989. Significantly, he never filed a motion for recusal or disqualification, despite his representation that he would file such a motion before the hearing. Instead, he stated at the hearing:

> I would ask if your Honor is to rule against us that you notify us, do not make the rulings final. I would be filing before the day is over a motion for recusal, request to stay final ruling on the current matters and requesting discovery.

Counsel and Judge Coyle then engaged in the following colloquy regarding the recusal motion:

> MR. WANGER [for the Winery]: [W]e have not been favored with this recusal motion or whatever the Court referred to as having been filed on the 27th. We received nothing.
>
> THE COURT: We haven't either. We have been told two times, three times, it was going to be filed, but we have never seen it. I assume it has not been filed.
>
> MR. WANGER: So there are no papers.
>
> THE COURT: Is that correct, Mr. Yanny?
>
> MR. YANNY [for Joseph]: To my knowledge, the motion has not been filed. I wanted to see what your Honor would do today with respect to making this 455 disclosure and the like, and we would then decide whether we wanted to seek discovery before final rulings.

Joseph's counsel never did file the promised recusal motion regarding the real estate, despite his statement at the hearing that he was "prepared to file a motion for recusal right now." As Judge Coyle noted in his August 4 order denying a new trial, "Mr. Yanny's comments at oral argument make clear that the failure to file the motion to recuse is deliberate and yet another example of Defendants' penchant for treating recusal motions as a game of hide the ball."

Joseph and his counsel already had succeeded in getting Judge Price to transfer the case after he ruled against them on the counterclaims. They knew at the time of the transfer to Judge Coyle that McCormick, Barstow had represented the Winery in the Gallo Salame matter while Judge Coyle was a partner, but once again did not act on the information until they lost on the merits. This unexplained delay suggests that the recusal statute is being misused for strategic purposes. We therefore affirm Judge Coyle's denial of Joseph's posttrial motion for disqualification and a new trial.

## IV. Propriety of the Permanent Injunction

The district court granted the Winery's requested form of relief for Joseph's infringement of the GALLO mark: a permanent injunction against Joseph's use of his name as a trademark on retail packages of cheese. Joseph challenges the permanent injunction on several grounds. "The grant or denial of injunctive relief rests with the sound discretion of the trial court and requires a clear abuse of discretion for a modification or reversal." *Transgo, Inc. v. AJAC Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986).[9]

### A. Ambiguity or uncertainty of the injunction

Paragraphs 7–10 of the injunction, titled "Actions and Practices Enjoined," prevent

---

**9.** As an initial matter, the Winery contends that the panel should not review Joseph's challenges to the injunction because they were not raised below first. *See Gary H. v. Hegstrom*, 831 F.2d

Joseph from using the words GALLO or JOSEPH GALLO as a trademark for retail cheese. They further prohibit advertisement or registration of such a trademark. Paragraph 9 specifically prohibits the use of the word GALLO for any purpose in audible advertising. Paragraphs 11–15, titled "Actions and Practices Not Enjoined," expressly allow the use of GALLO and JOSEPH GALLO on non-retail cheese. They also allow the use of "Joseph Gallo Farms" and "Gallo Cattle Company" as trade names, and the use of Joseph Gallo's name or signature on retail cheese labels and in written advertisements if limited in size and accompanied by a trademark not containing the word GALLO.

▇▇▇▇▇▇ Joseph argues that the injunction is not sufficiently "specific in its terms." *See* Fed.R.Civ.P. 65(d). Injunctions are not set aside under Rule 65(d) unless they are so vague that they have no reasonably specific meaning. *Portland Feminist Women's Health Center v. Advocates for Life*, 859 F.2d 681, 685 (9th Cir.1988). Joseph notes that paragraph 9 of the injunction precludes use of the words GALLO or JOSEPH GALLO in audible advertisements, while paragraph 12 permits use of JOSEPH GALLO FARMS and GALLO CATTLE COMPANY as trade names on retail packages of cheese and paragraphs 13 and 14 permit use of JOSEPH GALLO as a signature. Any purported conflict or ambiguity here is illusory. The district court included this provision in response to its finding that "Defendants conspicuously elected to use radio, a purely aural medium, as their primary advertising medium." Audible advertisements do not distinguish between trademarks and trade names. Print advertisements do.

· Joseph also contends that there is confusion between paragraph 12, authorizing the trade names GALLO CATTLE COMPANY and JOSEPH GALLO FARMS, and Paragraphs 13–14, limiting the size and presentation of the words JOSEPH GALLO on labels and advertisements. These provisions, taken together, do have reasonably specific meaning: Joseph may continue to explain to customers his participation in his business, but not as a trademark or trade name that causes confusion. The injunction conforms with Rule 65(d).

### B. First Amendment Claim

▇▇▇▇ Joseph argues that the injunction constitutes an impermissible restriction of commercial speech. This court previously has addressed and rejected essentially the same argument that Joseph raises. In *Transgo, Inc. v. AJAC Transmission Parts Corp.*, 768 F.2d 1001, 1021–22 (9th Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986), the court upheld against first amendment challenge an injunction prohibiting a trademark infringer's use of particular words because they tended to mislead and confuse consumers about the source of the product. The court found no first amendment violation, because misleading commercial speech can be restricted. *Id.* at 1022 (citing *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771–73, 96 S.Ct. 1817, 1830–31, 48 L.Ed.2d 346 (1976)); *see also Board of Trustees of University of New York v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 3032, 106 L.Ed.2d 388 (1989) (misleading commercial speech not protected by first amendment).

### C. Overbreadth

▇▇▇▇▇▇ While recognizing the district court's considerable discretion in fashioning the terms of an injunction, we must insure that it is tailored to eliminate only the specific harm alleged. An overbroad injunction is an abuse of discretion. *Lamb–Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 973 (9th Cir.1991). We conclude that the injunction appealed in this case was overbroad in two respects.

First, the prohibition against audible broadcast advertisements in Paragraph 9

1430, 1439 (9th Cir.1987) (Ferguson, J., concurring in the result) ("[O]bjections to injunctions generally must be first made to the district court prior to appellate review."). However, the majority in *Gary H.* did in fact consider the appellant's challenges to the injunction. 831 F.2d at 1432–33. In this light, Judge Ferguson's concurrence amounts to a dissent on the issue, and the majority opinion in *Gary H.* indicates that we may consider Joseph's challenges.

extends to "retail package[s] of cheese *or other product*" (original emphasis). At all other times in its consideration of this case, and in all other paragraphs of the injunction, the district court properly operated in the context of the actual marketing environment, where Joseph sold cheese, the Winery sold wine, and Gallo Salame, under license from the Winery, sold meat and cheese. For the district court to enjoin the use of Joseph's name in broadcast advertisement for as-yet hypothetical other products is an abuse of discretion in the highly fact-specific area of trademark law. We therefore delete the words "or other product" from Paragraph 9.

■ Second, the injunction by Paragraph 5 applies to the Defendants "as well as to their descendants, successors or assigns." The Supreme Court has upheld injunctions that apply to "successors and assigns." *See Regal Knitwear v. NLRB,* 324 U.S. 9, 14–15, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945); *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 179, 94 S.Ct. 414, 422, 38 L.Ed.2d 388 (1973). Without this language, the injunction theoretically might be defeated by assignment; at the very least an avenue for further litigation would be left open. However, the reference to "descendants" is potentially troubling. Any descendant who enters Joseph's business will be covered by the term "successors." The term "descendants" might reach others in unforeseen ways. We therefore delete the reference to "descendants" in Paragraph 5.

■ A similar problem also arises in Paragraph 15, which provides that the paragraphs permitting certain uses of the names GALLO and JOSEPH GALLO

> shall remain in effect only so long as a person whose surname at birth is Gallo is an owner, principal or active participant in the business of defendant Gallo Cattle Co. or any successor or assignee of Gallo Cattle Co.

It is apparent from the structure of the injunction that Paragraphs 11–14 are intended to allow Joseph to continue to use his own name in some meaningful but not misleading fashion. Paragraph 15 intends to remove this special protection when no one named Gallo can claim a legitimate desire to use his or her own name in the business. As written, however, Paragraph 15 places a needless burden on defendants. If Joseph's family chooses to sell the business, they may be unable to capitalize on the goodwill accrued in non-misleading pursuits, because a non-Gallo buyer would be forced to operate under a more restrictive injunction than Joseph did. This inappropriate result will be removed by striking Paragraph 15 in its entirety. Since the injunction as it applies to Joseph eliminates consumer confusion and protects the Winery's mark, it will continue to do so should the business be transferred to a non-Gallo successor.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of the Winery on Joseph's counterclaims, its judgment of trademark infringement and its denial of a new trial. The terms of the district court's injunction are also AFFIRMED, but with the modifications described in Part IV.C. of this opinion.