## SELF–INSURANCE INSTITUTE OF AMERICA, INC. Plaintiff,

v.

## SOFTWARE AND INFORMATION INDUSTRY ASSOCIATION, Defendant.

## No. CV 99–4101 FMC(AJWx).

United States District Court, C.D. California.

April 27, 2000.

ing the appointment of counsel concerning his or her eligibility.''

Bernard C. Jasper, John Y. Igarashi, Horwitz & Beam, Irvine, CA, for Plaintiff.

Fletcher W. Paddison, Miller, Boyko & Bell, San Diego, CA, Terrence Reilly McInnis, John Kirk Donnelly, Ross, Dixon & Bell, Irvine, CA, for Defendant.

**Order Granting Defendant's Motion for Summary Judgment**

COOPER, District Judge.

### I. Introduction

Both plaintiff, Self–Insurance Institute of America, Inc. ("Self–Insurance"), and defendant, Software and Information Industry Association, ("Software"), are trade associations. Self–Insurance filed a complaint against Software for trademark infringement, 15 U.S.C. § 1125(a); trademark dilution, 15 U.S.C. § 1125(c); and unfair competition, California Business and Professions Code § 17200. Self–Insurance's complaint alleges that Software's trademark is confusingly similar to Self–Insurance's registered trademark. Software's motion for summary judgment, or in the alternative for an order declaring certain issues to be without substantial controversy, is pending before the Court.

### II. The Parties' Marks

Self–Insurance's complaint alleges that Software's Mark infringes on its registered trademark. According to the trademark registration, Self–Insurance's registered mark is a composite mark that includes "SIIA" and the eagle design ("Self–Insurance's Mark").

Software uses a composite mark that includes "SIIA," "Software and Information Industry Association" and a circle design ("Software's Mark").

**SIIA**

**Software ® Information Industry Association**

### III. Summary Judgment Standard

Summary judgment or summary adjudication is only proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. Rule Civ. Proc. 56(c); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. Proc. 56(e). Summary judgment is appropriate where the nonmoving party fails to make a sufficient showing on an essential element of the case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Ninth Circuit has stated that summary judgment is generally disfavored in trademark cases because of the inherently

factual nature of most trademark disputes. *See Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1356 n. 5 (9th Cir.1985). However, *Levi Strauss* does not preclude the Court from determining the likelihood of confusion as a matter of law on summary judgment. *See Murray v. Cable Natl. Broadcasting Co.,* 86 F.3d 858, 860–61 (9th Cir.1996); *Sykes Laboratory, Inc. v. Kalvin,* 610 F.Supp. 849, 860 (C.D.Cal. 1985) (where foundational facts (the *Sleekcraft* factors) can be discerned from uncontested evidence, the court can determine likelihood of confusion as a matter of law).

### IV. Parties' Evidentiary Objections

■ Federal Rule of Civil Procedure 56(e) states that affidavits supporting or opposing summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

#### A. *Self–Insurance's Objections*

#### *Declaration of Ken Wasch*

Wasch's declaration states that he is president of Software and Information Industry Association and was previously president of one of the two organizations that merged to form Software. These positions provide sufficient foundation for Wasch's personal knowledge of the activities and decisions of Software.

Self–Insurance's objection to paragraph five of the declaration of Ken Wasch is overruled because the paragraph does not contain the language Self–Insurance states is objectionable.

Self–Insurance objects to paragraphs eight, twelve and fifteen, arguing that Wasch lacks personal knowledge of the

facts and thus each is without proper foundation. Wasch has personal knowledge of Software's use of the acronym "SIIA" (paragraph eight), and the intent of Software in using "SIIA" (paragraph fifteen). Self–Insurance's objections to these paragraphs are overruled. Self–Insurance's objection to paragraph twelve is sustained. Wasch does not have personal knowledge of the services Self–Insurance provides. Self–Insurance's objection to paragraph fifteen, lines 4–8, is sustained for the same reason.

Self–Insurance also objects to paragraphs eight, thirteen and fifteen as inadmissible opinions or conclusions on the "ultimate issues."[1] Self–Insurance argues that paragraph eight goes to the ultimate issue of Software's intent in using "SIIA." However, the declaration merely states that Software began using "SIIA" because it is the acronym for its full name. Paragraph thirteen states that "Software believed that both Software and Self–Insurance could utilize the letters 'SIIA' … without causing confusion." Contrary to Self–Insurance's argument, this is a statement of Software's belief. Self–Insured's objection is overruled. Self–Insurance objects to paragraph fifteen arguing that it is an opinion as to the "ultimate issue" of the willful intent to infringe on the part of Software. Paragraph fifteen's statement that Software did not intend to benefit from Self–Insurance's goodwill is admissible. Self–Insurance's objection is overruled.

Self–Insurance objects to paragraph fourteen, which discusses the use of the acronym "SIIA" by other entities, based on relevancy. This paragraph is admissible only to the extent it is evidence of

---

**1.** Federal Rule of Evidence 704 states that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be

decided by the trier of fact." The Advisory Committee Notes to the 1972 proposed rule state that the "so-called 'ultimate issue' rule is specifically abolished."

Software's intent in using "SIIA." Evidence of multiple entities using an acronym other than "SIIA" is irrelevant and inadmissible. The objection is sustained in part.

### Declaration of Lauren Hall

Self–Insurance objects to paragraphs two and four of Hall's declaration which state that no one has expressed confusion about Software or Self–Insurance and that she did not know of anyone from Self–Insurance attending Software's conferences. Self–Insurance objects based on Hall's lack of knowledge of the state of mind of third persons as to confusion or that she knows the affiliation of persons who attend Software's conferences. Paragraphs two and four are not being admitted as proof of the ultimate issue of consumer confusion, but instead, that no one has expressed confusion to Hall. Similarly, paragraph four's statement about conference attendance does not purport to demonstrate that no one from Self–Insurance attended the conferences, but instead, that Hall did not know of anyone from Self–Insurance attending. Self–Insurance's objections are overruled.

### Declaration of Daniel Gonzalez

Self–Insurance objects to paragraph five which states that no one has contacted him expressing confusion based on Gonzalez's lack of personal knowledge of the state of mind of third persons. As explained above, the statement does not purport to be evidence that no confusion exists, only that no one has expressed confusion to him. Both Hall and Gonzalez have sufficient personal knowledge to make these statements. Self–Insurance's objections are overruled.

### Declaration of Monique Fuentes

Self–Insurance objects to paragraphs three, four, five, six, seven and eight of Fuentes' declaration based on relevancy. The Court assumes that Self–Insurance objects to the evidence found at corresponding exhibits V–AA on the same grounds. Paragraphs five and six identify exhibits which pertain to web domain names incorporating the terms "SIAA" and "self-insurance." Self–Insurance's objection to these paragraphs and exhibits is sustained. The use of an acronym other than "SIIA" is irrelevant to this case. However, paragraphs three and four, and their corresponding exhibits, are admissible as they deal with the use of "SIIA" by entities other than the parties to this action. Paragraphs seven and eight and their corresponding exhibits are evidence of the use of "siia.net" by Software and are admissible.

### B. Software's Objections

### Declaration of James Kinder

James Kinder is an officer and one of the founders of Self–Insurance. The Court finds that this position provides sufficient foundation for Kinder's personal knowledge of Self–Insurance's decisions and activities. It does not provide sufficient foundation for Kinder's personal knowledge of the decisions and activities of Software, the Patent and Trademark Office or any other entity. Accordingly, Software's objections based on Kinder's lack of personal knowledge as to the activities of Software or other entities are sustained. The following portions of paragraphs located at the following page lines are thus inadmissible: 8:17–23; 12:18; 15:11; 18:23–26; 19:27–28,1–3; 20:5–9,13–15,23–26; 25:23–24; 27:18–19,22–26; 32:6–26; 33:1–4; 37:26–28,1–3; 37:26–28,1–3; 38:4–8; 39:9–13; and 42:3–4.

Similarly, Kinder's position does not provide sufficient foundation for his personal knowledge of the state of mind of others. Specifically, Kinder does not have personal knowledge that others are "confused" by the use of the mark. The following objections based on Kinder's lack of

personal knowledge of the state of mind (confused) of third persons are sustained:

Software's objection to paragraph thirteen, lines 22–27, which states "Software's use of the mark was reinforced by calls to myself and to my staff from members and persons familiar with Self–Insurance Institute of America, Inc., regarding brochures that were being direct mailed by Software and Information Industry Association, bearing the letters 'SIIA' and causing them confusion." [2]

Software's objection to paragraph fourteen, lines 28, 1–2, which states "Based upon our receipt of e-mails from confused senders and the notification we received regarding persons being confused as to the origin of the mailing brochures . . . ." Software's objection to paragraph 22, lines 20–24, which states "Thus, confusion between Self–Insurance Institute of America and Software is not limited to membership, but extends to those we would seek to reach so that they can advertise and exhibit to Self–Insurance Institute of America Inc.'s membership."

Software's objection to paragraph twenty-nine, lines 12–15, which states "As such, and as has been the case, Self–Insurance Institute of America Inc.'s target businesses become confused when another organization uses the same acronym and mark."

Software's objection to paragraph thirty, lines 22–23, describing confusion by others and Software's use of the mark.

Software's objection to paragraph thirty-one, lines 25–28, 2, which states that Software's use is confusing and misleading to the public.

Remaining objections will be addressed individually. Software objects to paragraph 5, lines 18–19 which states that SIIA is "widely used within the academic community" and lines 22–23 which state "The 'SIIA' mark is in public use virtually everywhere we reference the Self–Insurance Institute of America . . . ." Software's objections are sustained. There is no basis to conclude that Kinder has personal knowledge of what goes on in the "academic community." Similarly, there is no foundation for his statement that the mark is "in public use virtually everywhere." To the extent this statement can be read as Self–Insurance identifies *itself* virtually everywhere as "SIIA," sufficient foundation exists as to Kinder's personal knowledge. Software's objection is sustained in part.

Software objects to paragraph six, lines 6–7, which states that "SIIA" is recognized by the public at large based on lack of personal knowledge and as an inadmissible opinion. The objection is sustained. There is no foundation for Kinder's personal knowledge of the recognition of the mark "SIIA" outside of Self–Insurance.

Software objects to paragraph eight, lines 24–25, which describes the Health Insurance Privacy and Portability Act based on lack of foundation as to Kinder's interpretation of the law. The objection is sustained.

Software objects to paragraph sixteen, lines 12–13, which states "On or about February 17, 1999, Mr. Wasch sent me a letter refusing to cease and desist using the SIIA mark." The objection is sustained. Kinder's description of the contents of the letter is inadmissible hearsay. The letter is attached as Exhibit 3 to Kinder's declaration and there is no need to explain its contents to the Court. Software's objection to paragraph seventeen, lines 17–19, which describes the letter

---

**2.** The statement is also inadmissible because the callers' descriptions of the brochures sent by Software are inadmissible hearsay. In addition, the statement "Software's use of the mark was reinforced" is an inadmissible opinion.

found at Exhibit 4, is sustained on the same grounds.

Software objects to paragraph twenty-three, lines 2–5, 9–11, which states "The confusion as to the e-mails is evidence that a significant amount of web traffic is also being misdirected because web address uniform resource locators ('URL') are fairly standardized" and "It is common experience and common knowledge that when people do not initially find a website which they seek on the internet, they often just give up." There is no foundation as to Kinder's personal knowledge of the state of mind of third persons, the role of URLs in misdirected e-mail, whether a "significant" amount of web traffic is being misdirected, or the practice of web users who do not find the site they are looking for to "just give up." The objection is sustained.

Software objects to paragraph twenty-four, lines 12–22, which describes the effect of Software's use of the mark on Self–Insurance's lobbying efforts and ability to acquire new members. These statements are inadmissible opinions and speculation not based on Kinder's personal knowledge or perceptions. Self–Insurance provides no evidence that its membership has declined or that its legislative efforts are less effective. The objection is sustained.

Software objects to paragraph twenty-five, lines 24–28, 1–14, which describes the contents of exhibits to the declaration of Ken Wasch, president of Software. The description of what is contained in the exhibits is inadmissible hearsay. Moreover, there is no need for Self–Insurance to describe the exhibits to the Court. The objection is sustained.

Software objects to paragraph twenty-eight, lines 27–28, 1–5, which describes the nature of associations, the type of services offered by associations and the use of acronyms to refer to associations, particularly in Washington, D.C. The objection is sustained. There is insufficient foundation to establish Kinder's personal knowledge about associations in general.

Software's objections to paragraph thirty-four, lines 8–18, are sustained. There is no foundation for Kinder's personal knowledge that "the use of SIIA is common place among the government relations community to mean the Self–Insurance Institute of America." Similarly there is no foundation for the statement "For another organization who is providing similar services to use the same acronym is not only confusing generally, but if articles quoting 'SIIA' representatives are not read extremely carefully (and with presumably more care than is typically given news articles), such confusion as to the source would lead the reader to have false impressions or information on the position" of Self–Insurance. These statements are opinion testimony that lack proper foundation for admissibility.

Software objects to paragraph forty, lines 14–17, which states "Not only has this caused confusion, confusion as to the proper addressing of e-mails, and confusion within the media, but it has the potential of adversely affecting the marketing and membership of Self–Insurance." There is no foundation as to Kinder's personal knowledge of such confusion. In addition, Kinder's speculation as to the impact on Self–Insurance's marketing and membership is inadmissible. The objection is sustained. Software's objections to paragraph forty-one, lines 18–28, are sustained as the statements are inadmissible as speculative and not based on personal knowledge. For example, lines 26–28 state "a web user could easily sign up for the wrong conference or give up upon realizing, if they are lucky enough to do so, that they have reached the wrong website."

*Declaration of Erica Massey*

Software objects to paragraphs six through eight of Massey's declaration which state that she provided e-mail to attorneys for Self–Insurance and described their contents. Software contends that Federal Rules 26(e)(1) and 37(c)(1) preclude Massey's testimony about documents that were not produced to Software. Rule 37(c)(1) precludes the use of evidence not disclosed as required under Rule 26(a) or 26(e)(1). Self–Insurance does not seek to admit the documents described by Massey as evidence. Accordingly, these paragraphs are admissible only to demonstrate that Massey turned over numerous e-mails to attorneys. To the extent the paragraphs contain Massey's description of the content of the e-mail, those statements are inadmissible hearsay.

Software objects to paragraph nine, lines 4–6, which states that Self–Insurance receives e-mail "from confused persons attempting to send e-mails to persons at Software . . . ." Because, there is no foundation for Massey's personal knowledge of the state of mind of the e-mail senders, the objection is sustained.

*Declaration of George Pantos*

Pantos is a lobbyist for Self–Insurance. This position provides sufficient foundation for his personal knowledge of Self–Insurance's lobbying activities.

Software's objections to paragraph three, lines 17–20, describing Software's use of the acronym are sustained based on Pantos' lack of personal knowledge of Software's activities. Software's objection to paragraph seven, lines 18–22, describing Software's lobbying activities is sustained on the same grounds. Software's objection to paragraph eleven, lines 26–28, 1–4, which describes Software's lobbying concerns is sustained on the same grounds.

Software objects to paragraph eight, lines 23–28, 1–3, which describes "corporate entities" who "are progressing toward increasing their profitability through e-commerce" and other technology, and states that confusion based on Software's use of SIIA will become greater. Pantos' position with Self–Insurance does not provide personal knowledge on which to base his statement about corporate entities or the conclusion that confusion will "become greater." The objection is sustained.

Software objects to paragraph nine, lines 12–14, which states "Software exhibitors have already expressed confusion . . . and this confusion is likely to become more widespread." The first statement is inadmissible hearsay. The second lacks foundation as to Pantos' personal knowledge. The objection is sustained.

Software objects to paragraph ten, line 18, which states Self–Insurance "is also identified as 'SIIA' on Capitol Hill." The objection is sustained. To the extent the statement could be read to state that Pantos identifies Self–Insurance as "SIIA" when lobbying on Capitol Hill, it is within his personal knowledge.

Software objects to paragraph fourteen, lines 14–17, which states that "SIIA" "is recognized on Capitol Hill, in the press, and by many national associations and coalitions . . . ." The objection is sustained based on Pantos' lack of personal knowledge of what these entities "recognize."

Software objects to paragraph fifteen, lines 18–22, which states "when a public policy position is attributable to SIIA, it should be clear that said position is attributable to Self–Insurance . . . . It is patently confusing and potentially harmful to Self–Insurance . . . ." These statements are conclusory and inadmissible opinions not rationally based on Pantos' perceptions. The objection is sustained.

*Declaration of Ashley Williams*

Ashley Williams is the staff liaison for Self–Insurance. This position gives her

personal knowledge of Self–Insurance's lobbying activities.

Software's objection to paragraph four, lines 26–28, describing Software's lobbying efforts and other activities is sustained based on Williams' lack of personal knowledge.

Software objects to paragraph five, lines 9–18 which describes Williams' interaction with a vendor who she asserts was confused by Software's use of SIIA. Lines 14–16 contain inadmissible hearsay. Lines 17–18 are inadmissible as Williams' has no personal knowledge of what conference the vendor was referring to in their conversation.

The objection to paragraph six is sustained. The entire paragraph is inadmissible hearsay.

Software objects to paragraph eight, lines 5–17, 1–2, which describes an instance where Williams "perceived" confusion on the part of the staff of a member of Congress. Williams' "beliefs" that she spoke to the Legislative Assistant (LA) for Technology who, she "believed" thought she was from Software, are not admissible facts as required by Rule 56(e). She has no personal knowledge of the state of mind of the LA with whom she spoke or the receptionist who transferred her call to that LA. To the extent an LA told her he needed to transfer her call to someone else, that statement is inadmissible hearsay. The objection is sustained.

*Declaration of Judith Dokter*

Software objects to paragraph two, lines 14–21, paragraph three, lines 24–28, 1–2, and paragraph four, lines 3–5, each of which relay what third parties have told Dokter about their confusion. Each of the statements is inadmissible hearsay. To the extent these paragraphs state that these persons were "confused," they lack sufficient foundation of Dokter's personal knowledge of the state of mind of these persons. The objection is sustained. Soft-

ware's objection to paragraph six, which states that entities who call think Self–Insurance is getting involved with software, is sustained based on lack of personal knowledge.

*Declaration of Ellen Rich*

Software's objections to paragraphs four and ten are sustained because each contains only inadmissible hearsay. Software objects to paragraph eight, lines, 7–10, which describes confusion by the "VP" and "events manager." There is no foundation for Rich's personal knowledge that others were confused. Her statement that she was confused as to the identity of the entity holding the conference is admissible. The objection is sustained in part.

*Declaration of Edward Neumann*

Software objects to paragraphs four and five, lines 14–19, which describe the "logos" of Software and Self–Insurance. The objections are sustained. The descriptions are irrelevant to the Court's analysis and lack sufficient foundation as to Neumann's personal knowledge of the marks. Similarly, Neumann's opinion that the logos are "extremely similar" is an inadmissible opinion. It may be rationally based on his perception, but it is not "helpful" as required by Rule of Evidence 701 for admissibility. Similarly, the statement that because both organizations are located in Washington, D.C., a closer inspection is required to determine their origins, is an inadmissible opinion.

## V. Uncontroverted Facts

Based on the parties' admissible evidence, the Court finds the following facts to be uncontroverted:

*Self–Insurance and its Mark*

1. Plaintiff Self–Insurance Institute of America, Inc., is a trade association in the business of promoting the interests of corporations, municipalities, associations and

other interested parties involved with self-insurance. Compl. ¶ 4.

2. Self–Insurance registered its service mark with the United States Patent and Trademark Office on April 9, 1996. The Mark includes the letters "SIIA" and an eagle design. The letters in Self–Insurance's service mark are an acronym for its full name. The registration states that Self–Insurance's first use of the Mark was January 1, 1984. Compl. Ex.A.

3. Self–Insurance's mission is to promote and protect the self-insurance option or alternative to risk funding. The focus of Self–Insurance is to support that mission by providing education, advocacy, communication, access to information, transfer of information, data collection and networking both in print and electronic format. Self–Insurance organizes conferences for its members. Its 1999 conferences focused on the following topics: managed care; electronic commerce; workers' compensation; property casualty; healthcare; and excess insurance markets. Within the electronic commerce arena, Self–Insurance is concerned with electronic claims processing, patient privacy, systems security, and dissemination of information. Self–Insurance is involved in several electronic commerce organizations. Vendors of electronic data and software systems are increasing participation in Self–Insurance activities because federal law requires that health claims be paid electronically by the year 2002. Self–Insurance lobbies the Education, Workforce, Commerce and Public Welfare committees of Congress. Kinder Dec. ¶¶ 7–8; Pantos Dec. ¶¶ 7, 9, 11.

4. Self–Insurance memberships range in cost from $1,295 to $25,000. Conference fees range from $496 to $1,595. Donnelly Dec. Ex. P–Q.

5. Self–Insurance uses "siia.org" as its internet domain name and maintains a website at that address. Kinder Dec. ¶ 7.

6. Self–Insurance uses "SIIA" in all of its printed material and other communication with members, the public, and governmental agencies. Kinder Dec. ¶ 4–5.

7. Kinder, an officer and founder of Self–Insurance, does not believe Self–Insurance is known throughout the country "to the extent Coca–Cola is known." Donnelly Supp. Dec., Ex. BB, Kinder Dep. 133:7–17.

8. Self–Insurance requested that Software stop using "SIIA." Kinder Dec. Ex. 2–3.

*Software and its Mark*

9. Defendant Software and Information Industry Association is the principal trade association for the software, digital content, and information publishing industries, and exists to provide global services in government relations, business development, corporate education and intellectual property protection. Wasch Dec. ¶ 3.

10. Software was formed on January 1, 1999, following the merger of Software Publisher' Association and the Information Industry Association. Wasch Dec. ¶ 7. Given the names of the heritage organizations and the industries the new entity would represent, the Boards of each organization named the new association the "Software and Information Industry Association." The use of "SIIA" followed from this choice. Wasch Dec. ¶ 8.

11. Prior to the merger, the organizations learned of the existence of Self–Insurance and its registered service mark. Software believed that, because the two organizations represent different industries and constituencies, it could use the acronym "SIIA" without causing confusion as to the connection between the organizations. Wasch Dec. ¶¶ 11–13.

12. The United States Patent and Trademark Office denied Software's application to register "SIIA." The application

requested a service mark for "SIIA" alone, without its circle design or the text of its name. Wasch Dec. Ex. E–F.

13. Software's major constituents are companies that develop and market products in the following industries: technology enabling the learning process or providing instructional content in digital form; software languages, authoring, development tools, operating systems and platforms; client-server, enterprise source planning and other enterprise-wide software products; applications and digital content for home or business use; software applications for horizontal and vertical markets; dynamic content for specific industries or general business use; financial information transmitted on public or private networks; internet portals and aggregators of digital content; businesses for whom the internet is the principal product-delivery mechanism; and business supporting growth in the code and content industries. Wasch Dec. ¶¶ 3 & 6; Exs. C–1 & H.

14. In representing the interests of these companies, Software's principal functions include: promoting the common business interests of the software and information industries as a whole; working to ensure intellectual property protection; and acting as a resource for member companies about issues affecting their business and customers. Software sponsors specialized research, surveys, conferences, seminars, workshops and other educational and networking events. Wasch Dec. ¶¶ 3, 4 & 6; Exs. A–C.

15. In virtually every document circulated by Software that contains "SIIA," Software's complete mark, which includes the circle design and the text of its name, is displayed. Wasch Dec. ¶ 10, Ex. A–D.

16. Software memberships range in cost from $795 to $125,000. Conference fees range from $495 to $1,595. Wasch Dec. ¶ 5; Ex. A.

17. Software does not plan to expand its services to include those related to self-insurance, insurance, reinsurance, insurance-related risk management, insurance underwriting, or managed care. Wasch Dec. ¶ 6.

18. Software registered the internet domain name "siia.net" and Software's website can be found at www.siia.net. Wasch Dec. ¶ 17.

*Other Facts*

19. There is de minimis overlap in membership between the two organizations. 1999 Software Membership Directory, Ex. H to Wasch Dec.; Self-insurance membership list printed January 5, 2000, Ex. O to Donnelly Dec.

20. In the few instances of dual membership (namely Price Waterhouse Coopers, Ernst & Young, Fidelity Investments and Merrill Lynch), the respective contact persons at such member entities are different. Software Membership Directory, Ex. H to Wasch Dec. at 537–38, 545, 638–39 and 686–87; Self-insurance membership list printed January 5, 2000, Ex. O to Donnelly Dec. at 1264–65, 1277 and 1284.

21. The only overlap between the topics covered by the two organizations is as follows: Self–Insurance is involved in technological issues such electronic payment of benefits, electronic claims processing, patient privacy, systems security and dissemination of information. Kinder Dec. ¶¶ 7–8; Pantos Dec. ¶ 9. Software is not involved in providing any services related to self-insurance issues. Wasch Dec. ¶ 6.

## VI. Trademark Infringement

■ "The core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products." *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1290 (9th Cir.1992). The Court's concern

for confusion among "consumers" as opposed to the general public is grounded in the very purpose of trademark law.

> [T]rademark law, by preventing others from copying a source-identifying mark, "reduce[s] the customer's costs of shopping and making purchasing decisions," for it quickly and easily assures a potential customer that this item—the item with this mark—is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past. At the same time, the law helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product.

*Qualitex Co. v. Jacobson Products Co. Inc.*, 514 U.S. 159, 163–64, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (citation omitted).

In this case, the question is whether a reasonable consumer seeking the services of a trade association might confuse Software's services with Self–Insurance's services. *See Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir.1998) (the question is "whether a reasonable consumer attending a Dreamwerks-sponsored convention might do so believing that it is a convention sponsored by Dream Works."); *Murray v. Cable Natl. Broadcasting Co.*, 86 F.3d 858, 861 (9th Cir.1996) ("A likelihood of confusion exists when a consumer viewing a service mark is likely to purchase the services under a mistaken belief that the services are, or are associated with, the services of another provider.").[3]

■ Finally, a "likelihood" of confusion requires the Court to find that confusion is "probable, not simply a possibility." *See Murray*, 86 F.3d at 861. Thus, the law requires "a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." *International Association of Machinists and Aerospace Workers, AFL–CIO v. Winship Green Nursing Center*, 103 F.3d 196, 201 (1st Cir.1996)

■ The Court looks to eight factors set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.1979), to determine the likelihood of consumer confusion: (1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the sight, sound and meaning of the marks; (4) evidence of actual confusion; (5) degree to which the marketing channels converge; (6) types of goods and degree of care consumers are likely to exercise when purchasing; (7) intent of defendants in selecting the infringing mark; and (8) likelihood that the parties will expand their product lines. *Id.* at 348–50; *see also Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir.1993); *Gallo*, 967 F.2d at 1290.

■ This list of factors is neither exhaustive nor exclusive and is intended to guide the Court in assessing the basic question of likelihood of consumer confusion. *See Gallo*, 967 F.2d at 1290. Because these factors are not to be applied in a mechanical manner, *see Dreamwerks*, 142 F.3d at 1129, the Court considers the *Sleekcraft* factors in order of their importance to the pending case. *See Brookfield Communications Inc., v. West Coast En-*

---

**3.** Self–Insurance offers evidence that media reports have identified agents of "SIIA" without specifying which organization and that Congressional staff members have confused the initials "SIIA" with Software. However, the Court's inquiry is whether a "reasonably prudent consumer" would be confused as opposed to those in the media or others who deal with the organizations. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir. 1979). Whatever confusion is expressed or perpetuated by the unspecific use of "SIIA" by third parties, it is not the subject of trademark protection.

*tertainment Corp.*, 174 F.3d 1036, 1054 n. 16 (9th Cir.1999); *Dreamwerks*, 142 F.3d at 1129. It is clear that if the goods or services are totally unrelated, there can be no infringement. *See Sleekcraft*, 599 F.2d at 348.

Self–Insurance argues that the "evidentiary effect of registration" precludes summary judgment. Self–Insurance is correct that the registration certificate is prima facie evidence of the validity of the registered mark and the owner's exclusive right to use the mark. *See* 15 U.S.C. §§ 1057(b) & 1115(a). However, there is no dispute that Self–Insurance owns its Mark or that it has the exclusive right to use its registered Mark. Indeed, it is undisputed that Software is not using Self–Insurance's registered Mark.

 The only question before the Court is whether Software's use of its own Mark, which incorporates one element of Self–Insurance's Mark, creates a likelihood of consumer confusion.[4]

*Similarly of the Marks*

The greater the similarity between the two marks, the greater the likelihood of confusion. *See GoTo.Com Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000). Similarity is determined by the appearance, sound and meaning of the marks when considered in their entirety and as they appear in the marketplace. *See Id.; Dreamwerks*, 142 F.3d at 1131.

The parties' Marks, as to which there is no factual dispute, are the only evidence relevant to this factor. Software uses its composite Mark in virtually all of its documents. *See* Uncontroverted Fact ("UF") 15. Self–Insurance does not provide evidence to contest this fact or evidence of its own use of its Mark. A review of the documents provided by Software demonstrate that, in the vast majority of Self–Insurance's printed materials, Self–Insurance's composite Mark is used.

In *GoTo.Com*, the Court was struck by the similarity of two logos after a "single glance at the two images." Both contained white letters in green circles surrounded by a square yellow background. With one look at the two Marks at issue in this case, it is equally apparent that the Marks are *not* similar. Despite the fact that both Marks contain "SIIA," they each contain additional elements that are visually distinct. A large eagle, whose wing surrounds part of the letters "SIIA" is a predominant element of Self–Insurance's Mark. Software's Mark contains both a small circular design above "SIIA" and the text of its name spelled out.[5] These distinctions are not trivial.

The sound and meaning aspects of the Marks are irrelevant to deciding infringement in this case. Although both contain the acronym "SIIA" which is likely to be pronounced by saying each letter, "S–I–I–A," Self–Insurance does not assert a protectable interest in its acronym.

---

**4.** Self–Insurance asserts only a protected interest in its registered Mark. Self–Insurance's complaint does not allege that it has a common law, protectable interest in "SIIA" without the eagle based on use in commerce. In addition, there is no evidence that Self–Insurance attempted to registered either "SIIA" alone or the design alone. Even if Self–Insurance's complaint included a common law interest in "SIIA" alone, it would not be entitled to protection. "SIIA" is an acronym, which is a descriptive mark. *See CPP Ins.*

*Agency, Inc. v. General Motors Corp.*, 212 U.S.P.Q. 257, 260 (C.D.Cal.1980) *aff'd* 676 F.2d 709 (9th Cir.1982). Descriptive marks are weak and generally not entitled to protection without a showing of secondary meaning. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir.1979).

**5.** The placement of Software's full name varies. On some documents it appears below the "SIIA" and circle logo and on others to the right of the logo.

Self–Insurance makes much of the fact that the Patent and Trademark Office (PTO) denied Software's attempt to register "SIIA." Administrative decisions of the PTO are not binding on the Court, but are entitled to "consideration" by the Court. *See Guess?, Inc. v. Tres Hermanos,* 993 F.Supp. 1277, 1282 (C.D.Cal.1997). However, Software's application for registration was not for its composite Mark that includes "SIIA," the circle design and text. Only the similarity of the composite Marks is before the Court. The PTO's denial of Software's application to register "SIIA" is irrelevant to this case and thus is not entitled to consideration by the Court.

The Court finds that despite a common element, the Marks, as used in the marketplace, are not similar. This factor weights against concluding that there is a likelihood of confusion.

*The Relatedness of Goods or Services*

"Related goods are more likely than non-related goods to confuse the public as to the producers of goods." *Official Airline Guides,* 6 F.3d at 1392; *see also Gallo,* 967 F.2d at 1291 ("Where goods are related or complementary, the danger of consumer confusion is heightened."). Related services are those which could reasonably be thought by the buying public to come from the same source if sold under the same mark. *See Sleekcraft,* 599 F.2d at 348 n. 10. *Compare Official Airline Guides,* 6 F.3d at 1392 (both directories list hotel, airline offices and car rental agencies, within the United States but are not closely related because one is "primarily distributed with in the United States" and the other is distributed exclusively outside the United States) *with Brookfield,* 174 F.3d at 1056 (searchable database directed at video consumers was closely related to searchable database for entertainment industry professionals); *Gallo,* 967 F.2d at 1291 (wine and cheese are complementary products). Accordingly, if Self–

Insurance and Software do not compete to any extent, the likelihood of confusion is remote. *See Brookfield Communications Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1056 (9th Cir.1999).

Self–Insurance argues that because both Self–Insurance and Software are trade associations, there is an increased likelihood of confusion. Software argues that the two associations represent entirely different interests: self-insurance and alternatives to risk funding on the one hand and software and information technology on the other.

There is no factual dispute as to what services each entity provides. Self–Insurance provides education, advocacy, communication, information transfer, data collection and networking services to its members on the issues surrounding self-insurance and alternatives to risk funding. *See* UF 1, 3.

Software promotes the business interests of the software and information industries, works to ensure intellectual property protection and acts as a resource for members. Software focuses its efforts on the software, digital content and information publishing industries. *See* UF 9, 13, 14.

To the extent Self–Insurance is involved in technological issues, it is concerned with electronic payment of benefits, electronic claims processing, patient privacy, systems security and dissemination of information. *See* UF 3, 21. These technology issues are the only overlap between the two organizations' services and it is clear that Self–Insurance's focus on these technology issues is aimed at self-insurance or alternatives to risk funding.

Although an entity may choose to join both associations, it would do so only to serve two different interests. A comparison of the membership lists demonstrates that those companies which are members

of both maintain different contact persons for each association. *See* UF 20. Unlike consumers in *Brookfield* who could obtain the same service from each database, consumers cannot receive the same services or information from the parties in this case. *See* 174 F.3d at 1056. Although both lobby, provide information and organize conferences, it is the content of each of these that is relevant to the Court's analysis.

The Court finds that Self–Insurance and Software offer services that are non-related. Thus, this factor weighs against finding a likelihood of confusion.

*Degree of Care Exercised by Purchasers*

"Likelihood of confusion is determined on the basis of a 'reasonably prudent consumer.' ... What is expected of this reasonably prudent consumer depends on the circumstances." *Brookfield,* 174 F.3d at 1060.

When purchasing expensive items, the buyer is expected to be more discerning and less easily confused. *Id.; see also Gallo,* 967 F.2d at 1293 (if goods or services are expensive, it is assumed that buyers will exercise greater care in their purchases); *Sleekcraft,* 599 F.2d at 353 (same). A membership in Software ranges in price from $795 to $125,000. *See* UF 16. Membership in Self–Insurance cost between $1,295 to $25,000. *See* UF 4. Conference fees are similarly high. *See* UF 4, 16. Based on the relatively high cost, the Court finds that consumers seeking association services will be very discerning and not easily confused.

In addition to the high cost, the fact that the services are not fungible results in consumers that are highly discerning. A trade association has several important aspects, including, representing members' views to legislators, gathering and disseminating the latest industry information and providing fora for networking opportunities and education. None of these can be

achieved by joining a trade association that is irrelevant to the business of the member organization. It is clear that an entity looking for information on self-insurance would not be served properly by Software and vice versa. Accordingly, consumers will purchase memberships or pay for other services only where the topical focus meets their needs.

There is no danger that consumers who would otherwise purchase Self–Insurance's services will instead purchase Software's even if, at first, they mistakenly assume that the entities are one and the same based on their acronyms. In fact, it is unclear how Software could gain anything by misleading consumers as to its relationship with Self–Insurance. Should consumers desire self-insurance related services or information, they will quickly learn that Software cannot meet their needs and will not purchase its services.

The Court finds that consumers seeking association services are highly discerning and not easily confused. This factor weighs heavily against finding a likelihood of confusion.

*Strength of Mark*

A strong mark is inherently distinctive and will be provided broad protection. *See Sleekcraft,* 599 F.2d at 349. The strength of a mark is determined by its placement on a continuum of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, (5) fanciful. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *see also Gallo,* 967 F.2d at 1291. The last three categories are deemed inherently distinctive and entitled to protection. *See Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753. In contrast, generic and descriptive marks require a showing of consumer association of the mark with a particular source, or second-

ary meaning, before receiving protection. *See Gallo,* 967 F.2d at 1291.

 To determine the distinctiveness of Self–Insurance's composite Mark, it must be viewed "as a whole, as it appears in the marketplace." *Official Airline Guides,* 6 F.3d at 1392.[6] "SIIA" is a descriptive mark because it is the acronym for Self–Insurance's full name, *See CPP Insurance Agency, Inc. v. General Motors Corp.,* 212 U.S.P.Q. 257, 260 (initials derived from a corporate name are descriptive and entitled to protection only if they have acquired a secondary meaning) *aff'd* 676 F.2d 709 (9th Cir.1982). However, the eagle design must be considered either arbitrary or fanciful because it tells nothing about the services Self–Insurance provides. *See Sleekcraft,* 599 F.2d at 349.

Software argues that Self–Insurance's Mark is weakened by the fact that other organizations refer to themselves by the acronym "SIIA" and use "siia" as part of their internet address. *See* Fuentes Dec. Ex V–W. It is true that third-party use of a mark weakens a registered mark. *See Data Concepts, Inc. v. Digital Consulting, Inc.,* 150 F.3d 620, 625 (6th Cir.1998). However, this general proposition is inapplicable to this case where third parties use only one element of Self–Insurance's registered Mark.

The Court concludes that, when viewed as a whole, Self–Insurance's composite Mark is either suggestive because the acronym, which is a descriptive element, weakens the arbitrary or fanciful nature of the eagle design. Because suggestive marks are entitled to protection, this factor weighs in favor of finding a likelihood of confusion. However, given the dissimilarity of the Marks and the non-relatedness of the services, the strength of Self–

Insurance's Mark bears little on the Court's analysis.

*Intent*

 When the alleged infringer knowingly adopts a mark similar to another's, the Court presumes an intent to deceive. *See Brookfield,* 174 F.3d at 1059; *Sleekcraft,* 599 F.2d at 354. Software offers ample evidence that it did not intend to make consumers believe that it is affiliated with Self–Insurance. *See* UF 11. However, a lack of intent to confuse is "largely irrelevant in determining if consumers likely will be confused." *Brookfield,* 174 F.3d at 1059 (citation omitted). The Court finds that Software's lack of intent does not bear on the likelihood of confusion analysis. *See Id.,* at 1059–60.

*Evidence of Actual Confusion*

Evidence of actual confusion is persuasive proof that future confusion is likely. *See Official Airline Guides,* 6 F.3d at 1393; *Sleekcraft,* 599 F.2d at 352. Proving actual confusion is difficult, however, and courts often discount such evidence because it is unclear or insubstantial. Accordingly, survey evidence is admissible to show actual confusion. *See Levi Strauss,* 778 F.2d at 1360, *see e.g., Wendt v. Host International Inc.,* 125 F.3d 806, 813 (9th Cir.1997); *Gallo,* 967 F.2d at 1292. However, neither Self–Insurance nor Software conducted a survey to provide the Court with evidence on this factor.

Self–Insurance's admissible evidence includes only two statements from individuals who state they were confused by Software's Mark.

The declaration of Edward Neuman states "When I received mailings from Software and Information Industry Associ-

---

**6.** This approach is also required by the fact that Self–Insurance registered only the com- posite Mark.

ation, I thought they might be from the Self–Insurance Institute of America, Inc., because there was no other information on the front of the brochure identifying them as being from Software and Information Industry Association." Neumann Dec. ¶ 6.

The declaration of Ellen Rich states "I looked at the brochure, saw the SIIA logo and understood the brochure to have originated from the Self–Insurance Institute of America, Inc." "The brochure was for a Software and Information Industry Association event." Rich Dec. ¶¶ 3, 5.

At most, the Court can infer from Neumann's declaration that the front of the brochure caused him to believe it was from Software. A description of the remaining parts of the brochure is conspicuously absent. Nuemann does not state whether his confusion remained or was immediately relieved upon viewing the remainder of the document. Rich's declaration does not state what portion of the document caused her confusion.

Because neither declaration includes a copy of the brochure that caused the apparent confusion as to the source of the document, it is impossible for the Court to determine if the parties' confusion was based upon the composite logo or the use of "SIIA" alone.[7] In either case, the evidence is unavailing. As already explained, Self–Insurance has no remedy for any actual confusion caused by the use of "SIIA" alone. Moreover, there is ample, uncontroverted evidence that Software uses the circle design and the full text of its name whenever it uses "SIIA." *See* UF 15. To the extent Rich and Neumann assumed the document was sent by Self–Insurance despite the appearance of the circle design and the name of Software, it must be considered carelessness on the part of the reader. Confusion resulting from the con-

suming public's carelessness, indifference, or ennui will not suffice as actual confusion based on the Marks. *See, e.g., International Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Winship Green Nursing Center,* 103 F.3d 196, 201 (1st Cir.1996); *United States v. 88 Cases, More or Less, Containing Bireley's Orange Beverage,* 187 F.2d 967, 971 (3d Cir.1951).

Self–Insurance also points to numerous e-mail messages delivered to "siia.org" which were apparently intended for a recipient at "siia.net." As explained above, Self–Insurance has not asserted a protectable interest in "SIIA" alone and cannot base its allegations of infringement on another's use of that acronym. Further, to the extent that senders were confused, they were confused only to the proper e-mail address—more precisely, the top-level domain name of the recipients—not the services provided by Self–Insurance or Software. The e-mails found at exhibit J to the declaration of Kirk Donnelly are not evidence of actual confusion.

Software's evidence that no third parties have expressed confusion to two of its employees is properly viewed as a lack of evidence of actual confusion. *See* Gonzales Dec. ¶ 5; Hall Dec. ¶¶ 2, 4. Self–Insurance's evidence provides minimal evidence of actual confusion and does not support a finding of actual confusion in the marketplace. *See Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d at 1231; *International Ass'n of Machinists,* 103 F.3d at 201 ("Just as one tree does not constitute a forest, an isolated instance of confusion does not prove probable confusion."). This factor weighs against finding a likelihood of confusion.

*Expansion*

The only evidence presented on this factor is Software's statement that it will not

---

**7.** At oral argument on the motion, counsel for Self–Insurance informed the Court that both Neumann and Rich viewed Software's composite Mark on the brochures.

expand its services to cover areas dealing with self-insurance. *See* UF 17. Self–Insurance presents no evidence that it has plans to expand beyond its current services to provide those now provided by Software. Self–Insurance cannot create a genuine issue of material fact by asserting that one exists. *See Harper v. Wallingford,* 877 F.2d 728, 731 (9th Cir.1989). The Court finds there is no evidence that the parties will expand into each others' service areas. This factors weighs against finding a likelihood of confusion.

*Marketing Channels*

The remaining factor, overlap of marketing channels, is of little importance to the Court's analysis. Both parties rely on similar marketing channels: print media, the internet, etc. Convergent marketing channels increase the likelihood of confusion. *See Sleekcraft,* 599 F.2d at 353. However, where the services offered by the parties are not closely related, they target entirely different consumers. In this case, the parties' membership lists demonstrate little overlap in membership. *See* UF 19, 20. Because the target consumers of each association are different, this factor weighs little toward a finding of likelihood of confusion.

*The Sleekcraft Factors Weigh Against Finding of Likelihood of Confusion*

The Court finds that the most important factors to this case, the dissimilarity of the Marks, the unrelated nature of the services provided, the high degree of care exercised by consumers, all weigh against finding a likelihood of consumer confusion. In addition, lack of expansion and lack of actual confusion weigh against such a finding. Only the strength of the Mark and the overlap in marketing channels weigh slightly in favor of finding confusion.[8]

Self–Insurance argues that genuine issues of fact exist precluding summary adjudication of its infringement claim. However, it has provided no admissible evidence to controvert the material facts established by Software's evidence. Summary adjudication is appropriate where the nonmoving party fails to make a sufficient showing on an essential element of the case on which that party will bear the burden of proof at trial. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

The Court concludes that the parties' Marks are not confusingly similar. It is not likely that reasonable consumers, exercising ordinary care, will be confused by Software's use of its Mark. Without a likelihood of confusion, there can be no claim for infringement. Defendant is entitled to summary adjudication of plaintiff's trademark infringement claim.

## VII. Trademark Dilution

■ The Federal Trademark Dilution Act protects famous marks from dilution of the distinctive quality of the mark that may result from the unauthorized commercial use. *See* 15 U.S.C. § 1125(c). To prove a violation of the Act, Self–Insurance must demonstrate that (1) the mark is famous; (2) Software is making a commercial use of the mark in commerce; (3) Software's use began after the mark became famous; and (4) Software's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish Self–Insurance's services. *See Panavision International, L.P. v. Toeppen,* 141 F.3d 1316, 1324 (9th Cir.1998).

■ To be famous, "a mark [must] be truly prominent and renowned." *See Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 875 (9th Cir.1999); *Accuride*

---

**8.** As explained above, the eighth factor, Software's lack of intent to cause confusion, weighs neither for nor against finding a likelihood of confusion.

*Int'l Inc. v. Accuride Corp.*, 871 F.2d 1531, 1539 (9th Cir.1989) (anti-dilution law is designed "to protect only strong, well–recognized marks"). Famousness requires a showing greater than mere distinctiveness. *See Avery*, 189 F.3d at 877.

■ The Act sets out an eight factor test to determine if a mark is famous.[9] Nonetheless, most courts take an approach more akin to Justice Stewart's test for obscenity: we know it when we see it.[10] Unless a mark rises to the level of "KODAK" or "COKE," it is not considered famous and thus not afforded protection from dilution. *See e.g. I.P. Lund Trading v. Kohler, Co.*, 163 F.3d 27, 47 (1st Cir. 1998) (unlike COCO–COLA, which is so famous as to be judicially noticed); *Fruit of the Loom Inc., v. Girouard*, 994 F.2d 1359, 1362 (9th Cir.1993) ("FRUIT is far from being in the class" of TIFFANY, POLAROID, ROLLS ROYCE, KODAK, CENTURY 21, and OSCAR); *Sykes Laboratory, Inc. v. Kalvin*, 610 F.Supp. 849, 858 (C.D.Cal.1985) ("[t]he dilution doctrine is only available to protect distinctive marks as exemplified by such famous names as TIFFANY, POLAROID, ROLLS ROYCE, KODAK"). The Federal Circuit states: "[w]hen a trademark attains dictionary recognition as a part of the language, we take it to be reasonably famous." *B.V.D. Licensing Corp. v. Body Action Design, Inc.*, 846 F.2d 727, 728 (Fed.Cir.1988) (observing that BVD, KODAK, LEVI'S, COCA–COLA and SING-ER have dictionary listings and thus are entitled to protection from dilution).

Software offers the testimony of James Kinder, the founder and an officer of Self–Insurance, as evidence that Self–Insurance's Mark is not famous:

Q. Other than the insurance industry, insurance related industries, is it your contention that SIIA is known throughout the U.S. by the public at large as the Self–Insurance Association?

A. Not to the extent Coca–Cola is known. One of our objectives is to make it that way, yes.

Q. Is it your contention that among all employers in the United States, that SIIA is commonly known as relating to the Self–Insurance Association?

A. To all employers that would be a broad, that would be a very broad base.

Donnelly Supp. Dec., Ex. BB, Kinder Dep. 133:7–17.

■ Where the founder and officer of the Mark holder does not consider the Mark to be as well-recognized as COCA–COLA, the Court can hardly reach a different conclusion. Albeit brief, this is evidence is nonetheless compelling proof that Self–Insurance's Mark is not famous.

Self–Insurance argues that a material fact exists as to whether its Mark has attained distinctiveness in its relevant trading area. It is well settled that a party must show more than distinctiveness "to meet the threshold element of fame."

**9.** The Court considers eight non-exclusive factors to determine whether a mark is famous: (1) the degree of inherent of acquired distinctiveness of the mark; (2) the duration and extent of the use of the mark; (3) the duration and extent of advertising and publicity of the mark; (4) the geographical extent of the trading area in which the mark is used; (5) channels of trade for the goods or services with which the mark is used; (6) degree of recognition of the mark and the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought; (7) nature and extent of the same or similar marks by third parties; and (8) whether the mark is registered. *See* 15 U.S.C. § 1125(c)(1).

**10.** *See Jacobellis v. State of Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (Stewart, J., concurring).

*See Avery,* 189 F.3d at 877. In addition, the fact that Self–Insurance's Mark is known in its "relevant trading area" is insufficient; fame requires a mark to be nationally recognized. *See, I.P. Lund Trading,* 163 F.3d at 47 (the VOLA faucet, although well-known in the world of interior design, does not qualify as famous under the Dilution Act because it lacks national renown).

Self–Insurance also contends that because Software has not presented evidence on the eight factors listed at 15 U.S.C. § 1125(c)(1), it is not entitled to summary adjudication. Software's evidence established that a founder and officer of Self–Insurance does not believe the Mark is as well known as COCA–COLA. This is sufficient to demonstrate that the Mark is not famous. Because Self–Insurance will bear the burden of proof on the issue of whether its Mark is famous at trial, it must come forward with admissible evidence on the issue to avoid summary judgment. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (summary judgment is appropriate where the nonmoving party fails to make a sufficient showing on an essential element of the case on which that party will bear the burden of proof at trial); *see also Harper v. Wallingford,* 877 F.2d 728, 731 (9th Cir. 1989) (bald assertion that a genuine issue of material fact exists does not preclude summary judgment). Because Self–Insurance has not presented evidence to controvert Software's evidence that the Mark is not famous, Software is entitled to summary adjudication of Self–Insurance's claim for dilution.

**VIII. California State Law Claim**

█ Finally, Software argues that it is entitled to summary adjudication of Self–Insurance's claim for unfair competition under California Business and Profession Code §§ 17200 et seq. The ultimate test under both is "whether the public is likely to be deceived or confused." *Cleary v.*

*News Corp.,* 30 F.3d 1255, 1262–63 (9th Cir.1994). Accordingly, the Court's finding that Software's Mark does not infringe on Self–Insurance's Mark on the Lanham Act claim controls the resolution of the unfair competition claim. *See Id.* ("actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act."). Software is entitled to summary adjudication of Self–Insurance's claim for unfair competition under California law.

## IX. Conclusion

Software's motion for summary judgment, filed April 4, 2000, is granted.

IT IS SO ORDERED.